271 N.J. Super. 152 (1993)
638 A.2d 173
LEADERSHIP REAL ESTATE, INC., PLAINTIFF,
v.
BERNARD HARPER, DONALD KOLPAN, SUNRISE CLEANERS, WON YUN AND JOHN DOES 1 THROUGH 25 (SAID NAMES BEING FICTITIOUS), DEFENDANTS.
Superior Court of New Jersey, Law Division Essex County.
Decided October 15, 1993.
*156 Leonard C. Leicht, for plaintiff (Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, attorneys).
Irving Tobin, for defendants (Gluck and Tobin, attorneys).
SCHWARTZ, J.S.C.
Plaintiff seeks to recover from the defendant, Donald Kolpan (hereinafter "Kolpan" or "defendant"), a brokerage commission to which it claims it is entitled under an exclusive listing agreement *157 in connection with the sale of a dry cleaning and laundry business (hereinafter "the business") and the building and real estate (hereinafter "the property") where the business was operated. The contract of sale was signed and the closing took place after the expiration of the term of the exclusive listing agreement and the six-month extension period contained in that agreement. The matter was tried without jury.
Several issues have been presented which have not been previously addressed by New Jersey courts, including: (1) what is the meaning, for purposes of plaintiff's breach of contract claim, of the word "sold" as used in an extension clause contained in an exclusive listing agreement; (2) whether the doctrine of "efficient producing cause" applies to permit the broker to recover a commission following the expiration of the aforesaid six-month extension period, and (3) if so, whether the doctrine of "efficient producing cause" applies when the broker fails to prove that the buyer was first introduced to the seller or the property and business by the broker. Plaintiff also seeks to recover a commission based upon allegations of bad faith by the seller in reopening negotiations with the buyer during the six-month extension period without giving notice to the broker and in failing to consummate the transaction prior to expiration of that six-month extension period despite reaching a meeting of the minds with the buyer on price, cash and the amount of a purchase money mortgage about nine days before the extension period expired.
When plaintiff filed its complaint in February 1991, it sought to recover damages against not only the defendant, Kolpan, but also against his former partner, Bernard Harper ("Harper"), Sunrise Cleaners ("Sunrise"), the trade name of the business, and Won Yun ("Yun"), the buyer. The complaint pleaded claims of common law fraud, consumer fraud under the New Jersey Consumer Fraud statute, and "efficient producing cause" against each of the defendants. Prior to commencement of trial the court was informed by plaintiff's counsel that plaintiff had entered into a *158 voluntary dismissal of its claims against the defendants, Harper, Sunrise and Yun.
Although the complaint does not specifically plead a claim for breach of the listing contract, plaintiff asserted such a claim at the time of trial and that claim was tried by consent of the parties. Accordingly, the complaint is deemed amended to assert a claim for breach of the listing contract. R. 4:9-2; Walker Rogge, Inc. v. Chelsea Title and Guar. Co., 254 N.J. Super. 380, 396, 603 A.2d 557 (App.Div. 1992); Farese v. McGarry, 237 N.J. Super. 385, 390, 568 A.2d 89 (App.Div. 1990); 68th St. Apts., Inc. v. Lauricella, 142 N.J. Super. 546, 561 n. 3, 362 A.2d 78 (Law Div. 1976), aff'd o.b. 150 N.J. Super. 47, 374 A.2d 1222 (App.Div. 1977), certif. den. 75 N.J. 20 (1977). The claim for consumer fraud was not advanced either at trial or in any of the pretrial or post-trial briefs, and, accordingly, that claim is deemed abandoned.
After assessing the credibility of the witnesses who testified at the trial, I reached the findings of fact set forth below which are pertinent to resolution of the legal issues raised by the parties.

A. THE FACTS
Leadership Real Estate Inc. ("Leadership") is a corporation of New Jersey formed in 1974 by its principal, Sanford L. Schonberger ("Schonberger") who has been licensed as a real estate broker by the State of New Jersey since December 1972. Leadership specializes in commercial and industrial real estate.
Schonberger was customer of Sunrise, which for many years has operated a commercial dry cleaning and laundry establishment at 398 North Livingston Avenue, Livingston, New Jersey. Sunrise was operated through a corporation known as Arlyn, Inc., which was formed by Harper and Kolpan in 1978 to acquire the business. Harper and Kolpan were equal partners. The business was purchased from the Heimowitz brothers, one of whom was Harper's father and the other was Mrs. Kolpan's grandfather. The Heimowitz brothers and their wives also owned the property on which Sunrise was operated. Harper and Kolpan acquired title *159 to the property as tenants in common in December 1983 from Milton Heimowitz, Gussie Heimowitz and Elsie Heimowitz. The purchase of the property was made subject to a mortgage pursuant to the terms of which the sum of $15,000 a year was to be paid in twelve monthly installments to Gussie Heimowitz for the rest of her life and a like amount was to be paid to Milton Heimowitz and his wife Elsie Heimowitz, and to the survivor of them, for the rest of their lives. This mortgage, intended to secure the purchase price of both the property and business, was signed by Harper and Kolpan individually.
The listing agreement, signed by Harper, Kolpan and Schonberger on behalf of Leadership, provides in pertinent part as follows:
To: Leadership Real Estate Co., Inc. hereinafter designated as the listing broker;
In consideration of your listing and endeavoring to procure a purchaser for the property known as 398 North Livingston Avenue in the town of Livingston, N.J. the undersigned, as owner grants you, the Listing Broker, the sole and exclusive right to sell... my property for a period of 6 months from the date hereof, which right shall expire on the 14 day of March 1989. The proposed purchase price of said property is $1,200,000. There exists an assumable mortgage in the amount of N.A. with a N.A. year term at an interest rate of ___%. The seller will not give a purchase money mortgage. The owner agrees to pay the listing broker a commission of 10% of the gross purchase ... price which shall be considered earned, due and payable in full upon closing and passing of title ... Such commission shall be considered to have been earned in the event of a transaction reflecting the above price or any other price or terms to which the owner may consent to in writing.
The owner represents that he has the right to sell... said property and that he can and will execute a sales contract, and will deliver possession of said premises within 90 days days [sic] subsequent to the execution of a sales ... contract. In the event that the property shall be sold ... within a period of 6 months after the expiration of this agreement to anyone that the listing or cooperating broker has shown said property and registered the name of such prospect by certified mail or by personal service prior to the expiration of this agreement, the undersigned owner agrees to pay the foregoing commission to the listing broker" (emphasis supplied).
Although the listing agreement did not contain any reference to the business operated by Sunrise at the premises, both parties conceded that the agreement was intended to include, and the listing price did include, both the business and the property.
*160 Although the written agreement contained no restrictions on the activities of the broker, Schonberger conceded that Harper and Kolpan did not want him to advertise the business by name or location or to put a sign on the building since they were concerned that such advertising would adversely impact their business. They wanted Leadership to solicit purchasers in a low key manner through soliciting cleaning equipment suppliers for the names of such prospects, having Schonberger talk with his father-in-law who was in the laundromat business, and placing blind ads in local newspapers. Leadership placed advertisements in The Star-Ledger. One such ad, published on Sunday, October 16, 1988, read as follows: "DRY CLEANER  Prime West Essex loc. Hi vol bus. & prop. $1.2 mil. Call Wkdys. Leadership Brokers, 994-4089."
Leadership ran the above advertisement 2 or 3 times a week for the entire six-month period of the exclusive listing.
Schonberger and one of his employees, Ruth Blau ("Blau"), a licensed real estate salesperson working under Schonberger's supervision, knocked on doors of other dry cleaners, called laundry and dry cleaning equipment suppliers and spoke with a number of other people in an effort to obtain prospects for the purchase of Sunrise. Blau also answered telephone inquiries received in response to the newspaper ad. At Schonberger's request, Blau also contacted several dry cleaners located in Clifton. Blau also made calls to friends of hers in the dry cleaning business, and they suggested others who might be interested. When Blau made those calls, she never revealed the name or location of Sunrise's business. Leadership did not, however, maintain any records identifying the contacts which Schonberger and Blau made in an effort to solicit buyers for the business.
Although there was considerable dispute in the testimony of the parties over Leadership's involvement in locating Yun as a prospective buyer for the dry cleaning business and property, the court finds that Leadership had no role in locating Yun or introducing him to the property or to the sellers. Sometime in *161 October 1988 Yun appeared at the premises of Sunrise and informed Kolpan that he had been informed that the laundry business was for sale. Kolpan told Yun that the business was under an exclusive listing agreement with Leadership, that Yun would have to contact Leadership and that Kolpan could not negotiate directly with him. Yun learned that Sunrise was for sale through conversations he had had with Steve Bauer ("Bauer"), a salesman employed by Avis Machinery Co., a company engaged in the sale and service of dry cleaning equipment. Bauer had learned that Sunrise was for sale through a conversation he had had with Harper in 1987.
In October 1988 Yun owned a commercial dry cleaning and laundry business located in Edison, New Jersey, which he coincidentally also operated under the name "Sunrise Cleaners." In 1987 and 1988 Bauer serviced Yun's business in Edison, as well as that of Harper and Kolpan in Livingston.
At Kolpan's suggestion, Yun telephoned Leadership and spoke with either Schonberger or Blau to arrange an appointment. He then visited Leadership's office and met both Schonberger and Blau. He was taken by Blau to Sunrise for inspections of the building and equipment on three occasions prior to submitting any offer.
Sometime after the listing agreement was executed, Leadership had obtained from either Harper or Kolpan a real estate appraisal report dated February 10, 1988, which disclosed the appraiser's opinion that the property was worth $300,000. A financial report of Arlyn, Inc., dated September 30, 1987, had also been supplied to Leadership. That report reflected total assets, liabilities and shareholders' equity of approximately $150,000, of which approximately $44,000 represented shareholders' equity. Gross sales for the fiscal year ending September 30, 1987, totaled approximately $691,000, and net profits were reported at approximately $22,000.
Copies of Arlyn's financial statement and the real estate appraisal report were shown or given to Yun by Leadership before Yun made any offer. Yun also made telephone calls to Blau for *162 information concerning the dry cleaning wholesale accounts held by Sunrise, the number of its employees, the gross payroll, what Harper and Kolpan took home each week in salary, a breakdown of the percentages of gross income generated by the dry cleaning business and the shirt laundry business and some information concerning the apartments located on the second floor of the building occupied by Sunrise. Either Schonberger and/or Blau obtained the requested information from Kolpan and provided it to Yun.
By letter on Leadership's letterhead dated November 30, 1988, and signed by Yun, an offer to purchase the business and property was made to Kolpan and Harper. The offer provided the following two alternative options:

 Option 1.
 Purchase price: $800,000.00
 Cash at Closing: 600,000.00
 Purchase Money Mortgage: 200,000.00  Seven year term at 10% interest
 OR
 Option 2.
 Purchase price: $900,000.00
 Cash at Closing: 450,000.00
 Purchase Money Mortgage: 450,000.00  Seven year term at 10% interest

The offer further provided that the sale would include the property, the name Sunrise, all equipment presently installed for operation of the business and one van type truck, all of which the sellers were to represent that they owned free and clear. The offer also provided that the purchase was to be subject to the property meeting with ECRA standards and required removal at sellers' expense of all underground fuel tanks. The offer was accompanied by a $1,000 binder check furnished by Yun to Leadership to be held by it in escrow until closing of title.
The offer was hand delivered to Harper and Kolpan at the offices of Leadership on or about November 30, 1988, and was rejected by them at that time. After the offer was rejected, Schonberger had further communications with Yun in an effort to *163 persuade him to increase his offer. Those negotiations led to an improved offer which was delivered by Schonberger to Harper and Kolpan several days later. Yun increased his offer to a purchase price of $950,000 with $650,000 cash at closing and a $300,000 seven-year purchase money mortgage at 10% interest. This improved offer was also rejected by Kolpan and Harper. In rejecting this second offer, Harper made clear to Schonberger not only that the offer was insufficient but that he insisted upon an all cash offer and that under no circumstances would he accept any offer requiring the sellers to accept back a purchase money mortgage.
In the two weeks following the rejection of Yun's second offer Schonberger made several telephone contacts with Harper and Kolpan to try to get them to change their minds and accept a lower offer which contained terms for purchase money mortgage financing. Harper and Kolpan were not receptive to Schonberger's entreaties and persisted in demanding $1.2 million all cash. Schonberger also communicated with Yun during that two-week period, but Yun indicated that the second offer made by him was his final offer.
On December 16, 1988, Ms. Blau sent Yun a letter returning his $1,000 binder check and advising:
Although we have made our best efforts with these sellers, we were unable to convince them to accept your offer. If you would consider an increase of your offer, we would be happy to re-open negotiations. Also if anything else becomes available, we shall let you know.
Schonberger sent Kolpan and Harper a letter by certified mail also dated December 16, 1988, registering Yun with them. That letter also states:
Please be advised that if our client as shown herein above does successfully consummate a purchase of your property within a 24 month period following the expiration of our listing agreement, this brokerage maintains the claim that we were the causative factor in the transaction and will therefore be entitled to and receive a commission of 10% of the purchase price. This registration will cover Mr. Yun, members of his family, his agents and associates who may act in his behalf.
If Mr. Yun does increase his offer, we will so advise. In the meantime, we are returning his binder check.
*164 The above letter contains an obvious misstatement since the listing agreement provides for only a six-month extension period, not a twenty-four month extension period, during which any sale made by the defendants to Yun would be covered by the listing agreement and entitle plaintiff to a commission.
Plaintiff had no further contacts with Yun in an effort to induce him to increase his offer, nor did plaintiff have any further communications with Harper and Kolpan in an effort to persuade them to reduce their selling price or terms.
On November 4, 1988, Harper suffered a heart attack. He returned to work about a month after his heart attack. In about January or February 1989 Harper spoke to Kolpan about selling his interest in the property and business to Kolpan. Harper had had a fight with Mrs. Kolpan some time prior thereto and could no longer deal with the stress of working on a daily basis with her. Harper told Kolpan that he was desperate to sell and asked Kolpan to buy him out. Kolpan had no money and they agreed to mortgage the property in order to raise the funds necessary for the buyout. Harper insisted that all debts of the business be paid from the proceeds of any such mortgage and that Kolpan agree to assume Harper's obligations to Gussie and Elsie Heimowitz under the mortgage of December 21, 1983.
Harper performed light duty at Sunrise between December 1988 and March 1989 when he left the business entirely. A mortgage loan agreement was ultimately negotiated by Kolpan with The Maplewood Bank in June 1989 in the sum of $210,000. Following receipt of that loan commitment, Kolpan and Harper entered into a stock purchase agreement dated June 21, 1989, pursuant to which Harper agreed to accept $115,000 in cash and to transfer his stock and his interest in the property to Kolpan. Kolpan agreed to pay off all notes, mortgages and the trade indebtedness of the corporation and to assume responsibility for payment of $15,000 a year to each of the Heimowitz women for the balance of their lives. The sales contract estimated total indebtedness then owed by the corporation to be approximately $65,000. *165 The closing statement on The Maplewood Bank mortgage reflects a payoff of the first and two second mortgages totaling approximately $34,800 and various other closing costs leaving a net return to Kolpan and his wife from the proceeds of the mortgage of $159,132.17. From that amount Kolpan was required to pay off the trade debts of the corporation, and the $115,000 cash payment due to Harper.
The mortgage closing and the sale of Harper's interests to Kolpan took place on July 28, 1989. The value of Kolpan's agreement to assume Harper's mortgage obligations to the Heimowitz women, while not fixed precisely in the record, was of course dependent upon the life expectancies of these two women at that time. Although the record does not indicate their exact ages in 1989, both women were in their early to mid-eighties. Based upon the life expectancy tables appearing in Appendix I of the court rules, the life expectancies of the Heimowitz women in 1989 ranged from 6.32 years to 7.98 years. Although the exact extent of Kolpan's obligations in 1989 to the Heimowitz women could not be determined, application of their life expectancy figures places that value between $90,000 and $120,000. However, both the widows were still alive four years after the closing when this case came to trial, and Kolpan had already paid or incurred an obligation totaling $60,000 which would have been paid by Harper absent their agreement. Kolpan at the time of trial faced the reasonable prospect of having to pay an additional $60,000 to $75,000 for the remainder of the lives of those widows which would otherwise have been paid by Harper.
During the approximate eight-month period between the rejection of Yun's second offer by Kolpan and Harper in early December 1988 and the sale by Harper to Kolpan on July 28, 1989, there had been absolutely no contact between Kolpan and Yun. Approximately two weeks after that sale Kolpan decided to visit Yun's dry cleaning establishment in Edison. While there, he inquired as to whether Yun was still interested in purchasing the Sunrise business and the property. Yun expressed an interest but *166 not at the same price he had previously offered. Mr. and Mrs. Kolpan had a dinner meeting with Mr. and Mrs. Yun that evening during which the sale of the business was discussed.
Two subsequent dinner meetings took place, one of which was at the Kolpan residence where Yun also discussed purchasing the Kolpan residence as part of the deal but later concluded that he did not have sufficient cash to buy both the business and the Kolpan residence. By the time of the third meeting, the exact date of which is not clear, Kolpan and Yun had agreed upon a price of $800,000, of which $350,000 was to be paid in cash and the balance of $450,000 was to be financed through a purchase money mortgage. That meeting occurred some time shortly prior to September 5, 1989, the date on which Kolpan's attorney, Irving Tobin, Esq. ("Tobin") forwarded copies of the two proposed contracts he had prepared to Joseph K. Manzione, Esq. ("Manzione"), the attorney whom Tobin had been informed was then representing Yun.
During the negotiations between Kolpan and Yun in August 1988, Kolpan was fully cognizant of his responsibilities under the listing agreement to pay Leadership a commission in the event that a sale was made to Yun prior to expiration of the six-month extension period on September 14, 1989. At the time that these contracts were forwarded by Tobin to Manzione, there still remained nine days left on the six-month extension period.
Yun had retained Manzione sometime in late August or early September 1989 during his negotiations with Kolpan. A week or two later Manzione informed Yun that he could not represent him because Manzione was not feeling well. Yun then retained the services of Stanley Fink, Esq. ("Fink") to represent him in the transaction. Fink was retained in about mid-September 1989.
Fink contacted Manzione within a few days to a week after being retained. When Fink obtained Manzione's file, he found the proposed contracts prepared by Tobin. Fink contacted Tobin to correct certain errors and make certain changes in the contract documents.
*167 Fink determined that the contract documents prepared by Tobin were "bare bones" Allstate contract forms. Fink prepared two proposed riders, one for the real estate contract and one for the contract involving the sale of the business. Neither of those riders were identical with those attached to the final contract. There were extended negotiations between Fink and Tobin, by telephone, as well as correspondence and FAX transmissions, prior to October 11, 1989, the date on which the two contracts were signed by Yun and Kolpan.
Throughout the period of his negotiations with Yun, Kolpan was anxious to conclude a deal at the earliest possible moment. The delay in execution of the contracts of sale resulted from the withdrawal of Manzione as Yun's attorney, the protracted negotiations between Yun's attorney and Kolpan's attorney concerning the terms of the contracts of sale and certain concerns, discussed in detail later in this opinion, which Yun wanted resolved prior to signing of the agreements.
Kolpan's transfer of his stock interest in the business and the closing of title to the real estate took place on November 6, 1989.

B. THE BREACH OF CONTRACT CLAIM
At the conclusion of the plaintiff's case, counsel for defendant made a motion for an involuntary dismissal. The court granted that motion in part, dismissing the claim for breach of contract. The reasons for such dismissal are set forth below.
Under the contract the broker's right to earn a commission during the six-month period following expiration of the agreement arises only "[i]n the event that the property shall be sold ... to anyone that the listing ... broker has shown said property and registered the name of such prospect...."
No New Jersey case was found interpreting the phrase "the property shall be sold" within the context of an extension clause contained in an exclusive listing agreement. Plaintiff argued that it should be sufficient if the proofs established that there was a *168 meeting of the minds between Kolpan and Yun as to the total sales price, cash at closing and amount of purchase money mortgage prior to the expiration of the extension period. Defendant argued that there had to be a transfer of title, or at the very least, execution of written contracts between Kolpan and Yun for transfer of title to the property and purchase of the business prior to the expiration of the extension period contained in the listing agreement before any commission would be due and owing to plaintiff. Defendant argued that since the contracts involving the sale of the business and property were not executed by Yun and Kolpan until October 11, 1989, nearly a month after the expiration of the six-month extension period, defendant could not owe a commission to plaintiff under the terms of the contract.
The key principle governing construction of any contract is to ascertain the intention of the parties as revealed by the language contained in the contract. Jacobs v. Great Pacific Century Corp., 104 N.J. 580, 582, 518 A.2d 223 (1986); Karl's Sales Serv. v. Gimble Bros., 249 N.J.Super, 487, 492, 592 A.2d 647 (App.Div. 1991). The language "must be accorded a rational meaning in keeping with the expressed general purpose" of the agreement. Tessmar v. Grosner, 23 N.J. 193, 201, 128 A.2d 467 (1957). Where an ambiguity appears in the contract the writing is to be strictly construed against the party preparing it. In Re Miller's Estate, 90 N.J. 210, 221, 447 A.2d 549 (1982). In this case there is no doubt that the contract was prepared entirely by plaintiff. However, even though a contract provision should generally be construed narrowly against the draftsman, "the construction should be sensible and in conformity with the expressed intent of the parties." Broadway Maintenance Corp. v. Rutgers State Univ., 90 N.J. 253, 271, 447 A.2d 906 (1982).
The common understanding of the terms "the property shall be sold" requires, at a minimum, that a binding contract of sale be entered into between buyer and seller pursuant to the terms of which the buyer would have an equitable remedy of specific performance and the seller a remedy of damages for *169 breach by the buyer. Prior to execution of such a written agreement, neither party would have a remedy if the other withdrew from the deal. Since written contracts between Kolpan and Yun were not signed prior to expiration of the extension period contained in the exclusive listing agreement, that contractual condition was not satisfied, and plaintiff has no claim against Kolpan for breach of the listing agreement.
It is clear that under New Jersey law the owner becomes liable for commission "... only in the event a sale of the property is consummated, unless the title does not pass because of the owner's improper or frustrating conduct." Ellsworth Dobbs Inc. v. Johnson, 50 N.J. 528, 548, 236 A.2d 843 (1967). Prior to Ellsworth Dobbs, Inc., our courts interpreted the word "sale" in listing contracts providing for payment of a commission for "perfecting a sale" or "for the sale of the property" to render the owner liable for a commission upon execution by seller and buyer of a binding written contract for sale of the property even though the sale was not consummated and title not closed. Klipper v. Schlossberg, 96 N.J.L. 397, 399-401, 115 A. 345 (Sup.Ct. 1921); Freeman v. Van Wagenen, 90 N.J.L. 358, 360-61, 101 A. 55 (Sup.Ct. 1917). The rationale for that construction of the word "sale" in the listing contract was expressed by the Klipper court as follows:
The broker's work was done when by advertising or consistent personal activity and expenditure of time and effort, he had interested a willing and able customer, sufficiently to meet the vendor's terms, and execute a contract of sale. Kruse v. Ferber, 91 N.J.L. 470 [103 A. 409] (Sup.Ct. 1918).
When he had effectuated that status his work was at an end and the sphere of activity of the vendor to make good his proposal began. For the result of the effort the broker is not responsible, and his legal rights cannot in anywise be affected, unless he has specifically so contracted, as was the case in Leschziner v. Bauman, 83 N.J.L. 743 [85 A. 205] (1912); Morse v. Connolly [Conley], [83 N.J.L. 416, 85 A. 196 (Sup.Ct. 1912)] Id. 416 and in Volker v. Fisk, 75 N.J. Eq. 497 [72 A. 1011] (Ch.Div. 1909) where the sale specifically contemplated a perfecting of title in the vendee.
....
It follows, therefore, that the "sale" contemplated by the parties to this contract was not the actual passing or devolution of title, but the execution of a contract of *170 sale between the vendor and the proposed purchaser, upon terms satisfactory to both. Such a contract was executed, and with the execution of that instrument the "sale," so far as the broker was concerned, and so far as his efforts could effectuate a sale, was complete; and his legal right to compensation under the contract consequently became fixed and determined.
A similar construction should be given to the word "sold" as used in the extension clause with respect to determining the date when the property is "sold," with the caveat that no commission will be due and payable to the broker under Ellsworth Dobbs unless the sale is in fact consummated and title closed. Thus, even though the sale is not consummated and title is not closed until after expiration of the extension period, the broker will be entitled to commission if a binding written contract is executed by buyer and seller prior to expiration of the extension period.
This interpretation of the extension clause is in conformity with cases in other jurisdictions which have construed similar extension clauses. Leonard v. Fallas, 51 Cal.2d 649, 335 P.2d 665 (Cal. 1959); Doerflinger Realty Co. v. Fields, 281 S.W.2d 609 (Mo. Ct. App. 1955); Caruso-Goll v. La Nasa, 72 So.2d 13 (La. Ct. App. 1954).
As the court in Leonard v. Fallas, supra, 335 P.2d at 668 (citations omitted), held:
Where a land owner has agreed to pay a real estate broker a commission in the event of a sale, "a sale" means "the making of an executory binding agreement by which the property is to be sold to the purchaser obtained by the broker."
Applying the forgoing rules to the facts of the present case, it is evident that the property was sold "within 90 days after" the termination of the contract between plaintiff and defendant to a person "whose name" was registered with the defendant by plaintiff in writing before the termination of the contract. Therefore, pursuant to the terms of the contract, plaintiff was entitled to his broker's commission from defendant.
On the other hand, where a binding executory contract was not entered into between the seller and a buyer registered by the broker prior to the expiration of the extension period, the broker has been denied a commission pursuant to the terms of the brokerage agreement. Langford v. Pioneer Land Co., 250 So.2d 165, 167 (La. Ct. App. 1971); Robert H. Kent & Co. v. Burton, 248 Md. 693, 237 A.2d 736, 739 (Md. 1968).

*171 C. EFFICIENT PRODUCING CAUSE

Plaintiff argues that even if its breach of contract claim is lacking in merit, it is entitled to recover a commission at the contract rate upon the ground that it was the "efficient producing cause" of the sale by Kolpan to Yun. The doctrine of "efficient producing cause," sometimes referred to in the cases as "efficient procuring cause," has been applied frequently by New Jersey courts to permit a broker to recover a commission upon a sale made after expiration of an exclusive or non-exclusive brokerage contract.
In order to recover a commission under the "efficient producing cause" doctrine, the broker must prove that he or she caused his or her customer to negotiate with the seller and that the transaction is later consummated through direct negotiations between the seller and the broker's customer, even though the seller accepts terms different from those expressed in the listing agreement, providing the customer makes the purchase without a substantial break in the ensuing negotiations. E.g., Loeb v. Peter F. Pasbjerg & Co., 22 N.J. 95, 100, 123 A.2d 522 (1956); Houston v. Siebert, 129 N.J.L. 468, 473-74, 30 A.2d 35 (E. & A. 1943); Fry v. Doyle, 167 N.J. Super. 486, 493-94, 401 A.2d 265 (App.Div. 1979); certif. den. 81 N.J. 287, 405 A.2d 831 (1979); Mack v. Revicki, 47 N.J. Super. 185, 192-93, 135 A.2d 569 (App.Div. 1957); First N.H. Corp. v. Van Syckle, 37 N.J. Super. 469, 471-72, 117 A.2d 656 (App.Div. 1955).
An early expression of the rationale for permitting the broker to recover his or her commission upon a sale occurring after expiration of the listing agreement where the broker has been the "efficient producing cause" of the sale may be found in Vreeland v. Vetterlein, 33 N.J.L. 247, 249 (Sup.Ct. 1869):
It is certainly true, as a rule of law, that, under ordinary circumstances, where a broker, employed to sell property, brings about an introduction of a buyer, and when a negotiation, resulting in a purchase, ensues on that foundation, the owner and the buyer cannot, by any arrangement, disappoint the claim of the agent for remuneration. If this could be done, it is obvious the agent would, in all cases, be in the power of his employer, who, by taking matters into his own hands, could, at *172 will, defeat the just expectations and equitable rights of the broker or middleman. In this class of cases, the question then always is, whether, under the peculiar conditions of the given case, the agent was the efficient cause of the sale; and, when there is real doubt upon that point, such doubt must be resolved by the jury.
Accord Houston v. Siebert, supra, 129 N.J.L. at 473, 30 A.2d 35.
The issues here are (1) whether the doctrine of "efficient producing cause" may be applied when the contract of sale is signed and title is closed after expiration of an extension period contained in an exclusive listing agreement, such as the one here involved, and if so, (2) whether plaintiff has met its burden to prove that it was the efficient producing cause of the sale which gives rise to this litigation.
There does not appear to be any reported New Jersey case deciding whether or not the doctrine of "efficient producing cause" may be applied to allow a broker to recover a commission on a sale made after expiration of an extension period contained in an exclusive listing agreement.
Defendant relies upon Brenner & Co. v. Perl, 72 N.J. Super. 160, 178 A.2d 19 (App.Div. 1962), in support of his argument that in the absence of an express contact provision, the doctrine may not be applied to permit the broker to recover a commission on sales made after expiration of the extension period. However, Brenner & Co. does not consider the issue presented in this case and does not even discuss the doctrine of "efficient producing cause."
In Brenner & Co. v. Perl, supra, the listing contract provided that the seller would pay a commission to the broker only if the broker arranged a sale before the listing contract expired. The Appellate Division affirmed partial summary judgment on the contract claim because the sale was made after the listing contract expired. The broker does not appear to have relied upon the "efficient producing cause" doctrine, nor is the issue discussed in the court's opinion. However, the court reversed an order granting the vendors summary judgment on the broker's claim for tortious interference with its prospective economic advantage based upon deposition testimony tending to show that the vendors *173 had counseled the buyer to withhold his offer until the listing contract expired.[1]
Plaintiff relies upon the following out of state cases arising in Illinois, Florida, Louisiana, Nevada and California in support of its argument that the efficient producing cause doctrine should be applied to allow brokers to recover commissions where the contract is executed and the sale is made after the extension period. Wilson v. Roppolo, 207 Cal. App.2d 276, 24 Cal. Rptr. 437 (Cal.Dist. Ct.App. 1962); Marmon v. Decker Realty & Ins. Co., 313 So.2d 132 (Fla. Dist. Ct. App. 1975); Hamberlin v. Bourgeois, 289 So.2d 358 (La. Ct. App. 1973); Paine/Wetzel Assoc. Inc. v. Dockside Dev. Corp., 174 Ill. App.3d 999, 124 Ill.Dec. 607, 529 N.E.2d 588 (1988); Lyons v. Shane, 133 Ill. App.3d 820, 88 Ill.Dec. 843, 479 N.E.2d 456 (1985); Fox v. Stewart, 91 Ill. App.3d 201, 46 Ill.Dec. 828, 414 N.E.2d 881 (1980); Pilson v. Roush, 82 Ill. App.3d 187, 37 Ill.Dec. 904, 402 N.E.2d 906 (1980); Arthur Rubloff & Co. v. Comco Corp., 63 Ill. App.3d 362, 20 Ill.Dec. 338, 380 N.E.2d 15 (1978); Humphrey v. Knobel, 78 Nev. 137, 369 P.2d 872 (1962).
A number of the cases relied upon by plaintiff involved brokerage agreements which did not contain clauses providing for payment of commission on sales made during some specified time extension period following expiration of the agency agreement. Lyons v. Shane, supra; Arthur Rubloff & Co. v. Comco Corp., *174 supra; Marmon v. Decker Realty & Ins. Co., supra; Humphrey v. Knobel, supra. These cases involved sales made reasonably soon after expiration of the brokerage agreement under circumstances in which the "efficient producing cause" doctrine has typically been applied and thus afford no support for applying that doctrine to cases in which the sale is consummated after expiration of the contract extension period.
The Illinois cases which have applied the "efficient producing cause" doctrine to allow the broker to receive a commission on sales made after expiration of the extension period have required the broker to prove that there was a meeting of the minds between seller and buyer during the extended time period of the brokerage contract and that the broker was the efficient procuring cause of the sale. The leading Illinois case is Pilson v. Roush, supra, 402 N.E.2d at 909, where the court, in reversing a summary judgment for the defendant seller, reasoned as follows:
As previously stated, the plaintiff raised the theory of procurement and the defendant in a reply brief presented to the trial court his response to this theory. The response is to the effect that the two month grace period made a part of the contract was to prevent any claim for a commission by the plaintiffs for sales occurring after the expiration of the period. We fail to find this a logical explanation, since following the reasoning of the defendant, then any contract providing a grace period would bar a commission predicated upon the procurement theory even though there was bad faith on the part of the seller.
In the instant case we do not hold that the plaintiffs are entitled per se to a commission because they procured the ultimate purchaser of the property. We also do not intend to impute or infer bad faith on the part of the defendant, however, we do hold that there is a triable issue of fact, to-wit, were the plaintiffs the procuring cause of the sale in that the defendant and the purchaser had a meeting of the minds pertaining to the purchase of the property during the time period of the brokerage contract. If on examination of the record it can be fairly said that a triable issue of fact exists then a motion for summary judgment should not be granted.
The Pilson opinion has been interpreted to require proof both (1) that there was a meeting of the minds between buyer and seller during the extension period, and (2) that the broker was the efficient procuring cause of the sale in order for the broker to recover a commission on a sale made after the extension period has expired. See Tom Brinkoetter v. Cresthaven Country Club, *175 118 Ill. App.3d 554, 73 Ill.Dec. 933, 936, 454 N.E.2d 1182, 1185 (1983).
In Fox v. Stewart, supra, 414 N.E.2d at 884, the court, relying on Pilson v. Roush, supra, reversed a summary judgment entered in favor of the broker despite evidence that the property was eventually sold to a purchaser procured by the broker during the exclusive right to sell period contained in the brokerage agreement, holding that there was "a triable issue of fact as to whether there was a meeting of the minds between the seller and the purchaser during the period of the broker's agency so that the broker could be said to be the procuring cause of the sale."
Similarly, in Paine/Wetzel Assoc., Inc. v. Dockside Dev. Corp., supra, the court, relying upon both Pilson v. Roush, supra, and Fox v. Stewart, supra, found an issue of fact and reversed a summary judgment entered in favor of the broker despite evidence that the buyer was introduced to the seller during the period of broker's exclusive right to sell.
In Wilson v. Roppolo, supra, the seller had engaged in bad faith and misrepresentation. The seller had entered into a six-month exclusive brokerage agreement with the broker which contained a clause providing for payment of a commission if the property were sold or exchanged within ninety days of termination of the contract to anyone made known to the seller within five days after contract termination with whom the broker had negotiations during the contract term. In affirming a judgment for the broker awarding a commission on a sale consummated after the expiration of the extension period, the court reasoned.
There can be no doubt but that plaintiff within the time specified in the listing agreement brought the purchaser and the seller together, and that the purchaser was ready, able and willing to buy on terms satisfactory to the seller, even though those exact terms were not completely arrived at during the term of the listing agreement. It is clear too, that Henry, either in an attempt to avoid paying plaintiff a commission or because he preferred to deal directly with the purchaser, took out of plaintiff's hands, during the listing period, all negotiating with the purchaser. To deny plaintiff a commission under the circumstances of this case would be inequitable and unfair. Dawson, representing both Bernard and the corporation in whose name the title was to be taken, informed Henry that the *176 corporation would buy the ranch, the terms to be agreed upon. Henry agreed to sell upon that basis. Where the real estate broker brings the seller and buyer together and the negotiations continue beyond the expiration date of the commission agreement, the broker is still entitled to his commission. Particularly is this so in a situation like this where the seller takes the negotiating away from the broker and conceals that fact by stating that he had sold the ranch to somebody who `just knocked on the door.'

[24 Cal. Rptr. at 439.]
The only case cited by plaintiff lacking either the element of bad faith by the seller or proof of a meeting of the minds between buyer and seller during the contract extension period which applied the doctrine of "efficient producing cause" to determination of the broker's right to a commission on a sale made after expiration of the contract extension period is Hamberlin v. Bourgeois, supra.
In Hamberlin the seller gave the broker a ninety day exclusive on the sale of certain acreage and equipment. The brokerage agreement contained a provision pursuant to which the broker would receive a commission if the property was sold within sixty days after expiration of the exclusive to anyone to whom the broker had offered the property. The property and equipment were sold to the broker's customer twenty-four days after the extension period expired for approximately $2000 less than the listing price. The trial court found no evidence of collusion between the buyer and seller to deprive the broker of his commission and concluded that no binding agreement was made between them during either the exclusive or the 60 day extension period. The trial court further found that the buyer's initial knowledge that the property was for sale was acquired from two people other than the broker.
In reversing a judgment for the seller and entering judgment for the broker, the court in Hamberlin concluded that the evidence established that the broker had initially brought the buyer to the property and initiated negotiations with him for its purchase; that the buyer expressed a desire to purchase the property during the period of the exclusive but that he needed an F.H.A. *177 loan; that the broker assisted the buyer in filling out the loan application; that the F.H.A. loan was not approved either during the exclusive or the extension period; that the parties, without the broker's assistance, engaged in direct negotiations after expiration of the exclusive listing and, without any significant break in the negotiations, reached agreement within four or five days after the F.H.A. approved a loan to the buyer. Under the circumstances the court held the broker was the efficient producing cause of the sale and entitled to a commission. However, the court's opinion does not set forth any rationale stating why, in the absence of evidence of collusion between buyer and seller or bad faith by the seller, the doctrine of efficient producing cause should be applied when no meeting of the minds between seller and buyer was reached until after the extension period contained in the brokerage agreement had expired.
Moreover, the court in Hamberlin does not cite or attempt to distinguish two earlier decisions of the Louisiana Court of Appeals which, although not specifically discussing the efficient producing cause doctrine, affirmed judgments denying the broker a commission on a sale made after expiration of the extension period contained in the listing agreement because of the absence of any evidence in either case of bad faith by the seller or collusion between the buyer and seller to deprive the broker of his commission. Carey v. Humble, 212 So.2d 439, 441 (La. Ct. App. 1968); Langford v. Pioneer Land Co., 250 So.2d 165, 167 (La. Ct. App. 1971).
There are at least two cases not cited by counsel which have expressly held that the doctrine of efficient producing cause will not be applied to permit the broker to recover a commission when the contract at sale is signed after expiration of the extension period contained in the brokerage agreement. Kenney v. Clark, 120 Ga. App. 16, 169 S.E.2d 357 (Ga.Ct.App. 1969); Thayer v. Damiano, 9 Wash. App. 207, 511 P.2d 84 (1973).
In Kenney v. Clark, supra, plaintiff had received a two-month exclusive listing with a clause in the contract which allowed the *178 broker to recover a commission on any sale made within three months after expiration of the exclusive to any purchaser to whom the property was submitted by the broker during the term of the exclusive. The court rejected application of the efficient procuring cause doctrine to plaintiff's claim for a commission on a sale made after expiration of the three month extension period based upon its construction of the intent of the parties as expressed in the extension clause of the listing agreement. The court reasoned as follows:
There can be no doubt but that the parties sought to contract specifically against the contingency of the owner selling to a prospect who had in the first instance been procured by the broker with the knowledge of the owner, and to whom the owner has sold directly either during or after the termination of the agency. There was a meeting of the minds that if such a situation occurred within three months of the termination of the agency the owner would be liable to the broker for commissions, which provision precludes the owner from proving, as was done in the Crutchfield [v. Western Electric Co.,] case, supra [66 Ga. App. 161(1), 17 S.E.2d 246 (1941)], that the negotiations had been abandoned in good faith and that the parties had thereafter entered into a new contact of which the broker was not the procuring cause. Three months is a reasonable time, and here the parties have fixed by agreement the length of time after the termination of the agency during which the broker has a right to insist upon his commission. The express provision for liability within the time limited implies its exclusion thereafter.

[169 S.E.2d at 359.]
In Thayer v. Damiano, supra, the court, in declining to apply the efficient procuring cause doctrine to the broker's claim for a commission on a sale made two days after expiration of the 180-day extension, reasoned as follows:
We interpret the italicized provision [of the listing contract] to strictly require a sale of the property at issue to be consummated within 180 days after the expiration date of the contract for the brokers to be entitled to a commission. There must be some reasonable time period in which a real estate sale is to be consummated in order for a broker to recover a commission for finding "a buyer ready and willing to enter into a deal." In this instance the listing agreement itself provided such a reasonable time period, i.e., 180 days after the expiration date of the contract. The seller herein did not accept the buyers' counter-offer for $33,000 until the 182nd day after expiration of the contract. Therefore, under the terms of the listing agreement, plaintiffs are not entitled to a commission.
....

*179 However, plaintiffs claim that they are entitled to a commission on the basis that they were the procuring cause of the sale. Dryden v. Vincent D. Miller, Inc., 56 Wash.2d 657, 354 P.2d 900 (1960); Mueller v. Seefried, 54 Wash.2d 792, 345 P.2d 389 (1959); Feeley v. Mullikin, 44 Wash.2d 680, 269 P.2d 828 (1954). In none of those cases is there an issue of contract termination.
There is no contention made that the July 2nd acceptance by the sellers was for the purpose of fraud or delay in denying plaintiffs their commission. The reason given for the execution on the 182nd day was that it was not known until late in June that Farmers Home Administration would loan no more than $33,000 for the purchase of this property. Only after careful consideration of buyers' counter-offer did sellers accept it.
For the reasons expressed above, we disagree with the trial court's conclusion that plaintiffs were entitled to a brokers' fee plus attorney's fees based upon that amount. The real estate sale, consummated after the broker's agreement and the 180-day extension clause had both expired, did not entitle plaintiffs to a commission.

[511 P.2d at 86-87.]
There have also been a number of cases which, while not discussing the efficient producing cause doctrine, have denied brokers a commission on sales made after expiration of the extension period. Valkama v. Harris, 575 P.2d 789 (Alaska 1978); Langford v. Pioneer Land Company, supra; Carey v. Humble, supra; Robert H. Kent & Co. v. Burton, 248 Md. 693, 237 A.2d 736 (1968). In Valkama, Carey, and Langford, the courts based their decisions both upon their construction of the extension clauses in the listing agreements as evidencing an intent by the parties to preclude recovery of commissions on sales made after expiration of the extension periods and upon absence of evidence of bad faith by the seller or collusion between the seller and buyer to deprive the broker of a commission. In Robert H. Kent & Co. the court based its decision solely upon its construction of the listing contract.
In construing the listing agreement between plaintiff and defendant in this case, and in particular the extension clause, the court should accord the agreement "a rational meaning in keeping with the express general purpose." Joseph Hilton & Assocs., Inc. v. Evans., 201 N.J. Super. 156, 171, 492 A.2d 1062 (App.Div. 1985). Since the listing agreement was prepared by the plaintiff, any *180 ambiguities must be resolved against the broker. In re Miller's Estate, supra, 90 N.J. at 221, 447 A.2d 549. However, where the agreement is clear and unambiguous, the court will not alter the contract for the benefit or detriment of either party, but will give effect to the declared intention of the parties. Brenner & Co. v. Perl, supra, 72 N.J. Super. at 165-66, 178 A.2d 19. Mack v. Revicki, supra, 47 N.J. Super. at 193, 135 A.2d 569.
The extension clause drafted by plaintiff requires payment of a commission on any sale made within six months after expiration of the six-month exclusive agency "to anyone that the listing or cooperating broker has shown such property and registered the name of such prospect by certified mail or by personal service prior to the expiration of this agreement." The agreement thus requires payment of a commission to plaintiff when a sale is made within the six-month extension period, even where plaintiff is not the efficient producing cause of the sale, providing the sale is made to someone to whom the broker has shown the property and whose name has been registered with the seller prior to the expiration of the exclusive term of the agreement. Agreements worded similarly have generally been construed to require payment of the broker's commission on sales made within the extension period even where the broker is unable to prove that he or she was the efficient producing cause of the sale. Bass v. Banga, 656 F. Supp. 312, 314 (N.D.Ill. 1987); Galbraith v. Johnston, 92 Ariz. 77, 373 P.2d 587, 590 (1962); Delbon v. Brazil, 134 Cal. App.2d 461, 285 P.2d 710, 712 (Cal.Dist.Ct.App. 1955); Samuel Nichols, Inc. v. Molway, 25 Mass. App. Ct. 913, 515 N.E.2d 598, 601 (1987); Fischer v. Patterson, 97 N.H. 318, 86 A.2d 851, 852 (1952); Kaye v. Coughlin, 443 S.W.2d 612, 614 (Tex.Civ.Ct.App. 1969); Bonanza Real Estate, Inc. v. Crouch, 10 Wash. App. 380, 517 P.2d 1371, 1374-75 (Wash. Ct. App. 1974). See Annotation, "Brokers' Fees  Sale After Listing", 51 A.L.R.3d 1149, 1168-75 (1973). But see Lloyd Hammerstad, Inc. v. Saunders, 6 Wash. App. 633, 495 P.2d 349, 51 A.L.R.3d 1145, 1148 (1972), where the court held that "there must be some minimal causal relationship between the *181 activities of the broker during the listing period and the ultimate sale."
It is also clear that the activities of Leadership which would be sufficient under the terms of the contract to permit it to earn a commission for sales made during the extension period are not sufficient in themselves to establish that Leadership was the efficient producing cause of any such sale. Thus, mere showing of the property to someone who ultimately purchases that property and registration of that person's name with the owner does not prove that the broker was the efficient producing cause of the sale. C.B. Snyder Realty, Inc. v. BMW of N. Am., 233 N.J. Super. 65, 80-81, 558 A.2d 28 (App.Div. 1989); Weinstein v. Clementsen, 20 N.J. Super. 367, 372, 90 A.2d 77 (App.Div. 1952). In Weinstein v. Clementsen, the court noted that: "A broker does not earn his commission by the mere introduction of a buyer to the owner, but he must be the efficient procuring cause of the contract between seller and purchaser." Id. at 372, 90 A.2d 77. That principle was reiterated in Snyder Realty, supra, 233 N.J. Super. at 80, 558 A.2d 28, where the court held the effect of the broker's registration of a buyer's name with the seller to be as follows:
Registration of course does not prove that the broker was the efficient procuring cause of transaction. That determination depends upon many factors. At best registration advises the owner or lessor that, should a transaction be completed with the named customer, a commission will be claimed.
Accordingly, the extension clause providing for payment to plaintiff of a commission on sales made during the extension period provided Leadership with much broader rights to earn a commission on sales made after expiration of the exclusive term of the listing agreement than plaintiff would have had in the absence of such a clause. The unambiguous intent of the extension clause is also that the broker would have no right to earn a commission when a contract of sale is signed and title is closed after the extension period expired in the absence of bad faith by the seller, or collusion between the seller and purchaser, to defeat the broker's commission claim by delaying execution of the sales contract until after the expiration date.
*182 Had plaintiff, as drafter of the listing agreement, desired to retain the right to earn a commission on sales for which it was the efficient producing cause even though such sales were made after expiration of the extension period, plaintiff could have so provided "by foresight in the use of appropriate language in the agreement." Brenner & Co. v. Perl, supra, 72 N.J. Super. at 165, 178 A.2d 19.
The court's construction gives a rational meaning to the clause containing the extension period and is in accord with the general purpose of the contact. In this court's view evidence of a meeting of the minds between buyer and seller before expiration of the extension period can and should be considered on the question of bad faith or collusion but should not be conclusive on that issue. Bad faith or collusion should be proven by the broker and not merely assumed upon a showing of a meeting of the minds between buyer and seller. Moreover, while evidence of a meeting of the minds between buyer and seller may occur on certain key issues, such as price and cash, shortly before expiration of the extension period, there may be good faith negotiations between the parties and their attorneys on other important terms of the sales contract which continue past expiration of the extension period and which are not motivated by any intent to defeat the broker's claim for a commission.
As will be demonstrated below, plaintiff failed to satisfy its burden of proof on the issue of bad faith, and, accordingly, is not entitled to recover a commission on the sale made by Kolpan to Yun. Moreover, even if the court were to allow plaintiff to seek recovery of a commission under the efficient producing cause doctrine, the court concludes that plaintiff did not meet its burden to prove that it was the efficient producing cause of the sale.
Much has been made by defendant of the fact that Yun was not a prospect produced by plaintiff, but rather that Yun had learned independently from Bauer that Sunrise was for sale. Yun, in response to the information provided to him by Bauer, appeared at the premises of Sunrise in October 1988 and was referred by *183 Kolpan to plaintiff for negotiations concerning purchase of the business and property.
Defendant argues that since Yun's identity as a prospective purchaser was not made known to defendant as a result of plaintiff's advertising, sale or promotional efforts, plaintiff could not have been the efficient producing cause of the sale. No New Jersey case has been found in which a court has decided whether a broker can be the efficient producing cause of a sale where the broker had not introduced the purchaser to the seller or the property. In all of the New Jersey cases discussing the efficient producing cause doctrine which were reviewed by this court, the broker did in fact introduce the purchaser to the seller of the property. However, that fact is not the sine qua non to a broker's right of recovery under the doctrine of efficient producing cause.
The purpose of the six-month exclusive listing agreement in this case was not merely for plaintiff to locate and introduce prospective purchasers to Kolpan and Harper. Rather, plaintiff was also retained to negotiate and persuade anyone who might have an interest in purchasing the business and property to make an offer acceptable to defendants. This was clearly one of the reasons that Kolpan and Harper were willing to make the agency appointment to plaintiff exclusive for its six-month term and during that term to refer to plaintiff any prospective purchasers, including Yun, who might contact them independently of the advertising and promotional efforts of plaintiff.
That a prospective purchaser has learned of the availability of a property for sale through sources other than the broker and has introduced himself to the seller before an exclusive broker became involved in the negotiations are merely factors to be considered in determining whether the broker was the efficient producing cause of the sale. Other significant factors which should also be considered include the time and effort expended by the broker with the purchaser, the success of the broker in causing the purchaser to make an offer for the property and the efforts of the broker in negotiating with the purchaser, or in *184 causing the purchaser to negotiate directly and continuously with the seller, to bring about a meeting of the minds between seller and buyer. See 12 Am.Jur.2d, Brokers, § 190, at 933 (1964), where the following rule is stated:
If in other respects the broker may be deemed the procuring cause, this conclusion need not be changed because the broker did not personally introduce his principal and the customer, or never saw the customer, or was not the first to direct the attention of the customer to the particular party.
See also Van C. Argiris Co. v. Caine Steel Co., 20 Ill. App.3d 315, 314 N.E.2d 361, 366 (1974).
The factors to be considered in determining whether a broker is the efficient procuring cause of a sale were stated in 12 Am.Jur.2d, Brokers, § 190, at 932, as follows:
The term "procuring cause" as used in describing a broker's activity refers to a cause originating a series of events which, without break in their continuity, result in accomplishment of the prime objective of employment of the broker, which usually consists of procuring a purchaser ready, willing and able to buy property on the owner's terms or of effecting a sale. The negotiations with the customer or prospect need not be uninterrupted so long as the continuity of the broker's agency in bringing the transaction to a conclusion can be established. But if the negotiations are broken off and the broker thereafter abandons his efforts, or there is a substantial break in negotiations and the transaction is subsequently concluded by the principal without the aid of the broker, he may be denied any commissions.
When Kolpan and Harper rejected the offers communicated by plaintiff on behalf of Yun in late November and early December 1988, Schonberger unsuccessfully attempted to persuade Kolpan and Harper to accept Yun's second offer or at least to reduce the asking price below $1,200,000 and provide the purchaser with purchase money mortgage financing. When these efforts proved unsuccessful, Schonberger returned Yun's deposit check, registered Yun's name with Kolpan and Harper, abandoned all further contact with Yun, Harper and Kolpan, and made no further efforts to reopen negotiations between them.
For more than eight months there was no communication whatsoever between Kolpan, or anyone acting on his behalf, and Yun. By the time Kolpan did initiate direct negotiations with Yun, Kolpan had acquired sole ownership of the business and property. It was Harper who had been unwilling in November *185 and December 1988 to reduce the asking price or provide financing. By mid-August 1989 Yun was no longer willing to renew any of his earlier offers. The selling price of $800,000 negotiated during the August 1989 negotiations was $150,000 less than Yun's second offer of $950,000, and the cash amount to be paid at closing was only $350,000, rather than the $650,000 which Yun had previously offered.
The facts detailed above are remarkably similar to those in Murray Apfelbaum, Inc. v. Bernstein, 104 N.J.L. 664, 141 A. 750 (E. & A. 1928). In that case the broker had introduced the leasee to the owner and participated in negotiations conducted at the broker's office between the principals. When the parties reached an impasse over the lease price, negotiations were broken off. The broker continued his effort to break the deadlock for about two or three weeks thereafter and then discontinued all further efforts. About seven and one-half months later, the parties resumed direct negotiations and reached agreement on terms substantially different from those which had been discussed earlier at the broker's office. In affirming dismissal of the broker's suit for commissions, the court held that the broker had abandoned his efforts, that there was a substantial break in the negotiations, and that there was no evidence from which the jury could have found that the broker was the efficient procuring cause of the lease.
Similarly, in this case, the court concludes that after December 1988 plaintiff abandoned its efforts to bring about a sale of the business and property to Yun, that there was a substantial break in the negotiations and that Leadership was not the efficient producing cause of the sale by Kolpan to Yun.

D. THE BAD FAITH CLAIM
Plaintiff contends that Kolpan acted in bad faith by negotiating directly with Yun during the extended term of plaintiff's exclusive agency, by telling Yun not to worry about plaintiff's commission and by delaying consummation of the sale to Yun until after *186 expiration of the six-month extension period with the intent to deprive plaintiff of its commission.
Real estate broker agreements, like other contracts, contain an implied covenant of good faith pursuant to which the seller impliedly covenants she or he will do nothing which will have the effect of destroying or injuring the right of the broker to earn a commission. Kislak Co., Inc. v. Geldzahler, 210 N.J. Super. 255, 263, 509 A.2d 320 (Law Div. 1985). Bad faith will be found where the seller refuses without legal justification to close title (see Ellsworth Dobbs, Inc. v. Johnson, 50 N.J. 528, 551, 236 A.2d 843 (1967)); where the seller fraudulently conceals the existence of title defect, such as restrictive covenants in ancient deeds (Murray Apfelbaum, Inc. v. Topf, 104 N.J.L. 343, 140 A. 295 (E. & A. 1928)); where the seller materially represents to the broker and buyer the gross earnings of the business (George H. Beckmann, Inc. v. (Zinke's) Rainbow's End, Inc. 40 N.J. Super. 193, 122 A.2d 519 (App.Div. 1956)); where the seller misrepresents that a first floor apartment in the building being sold will be vacant on the date set for closing of title (Keifhaber v. Yanelli, 9 N.J. Super. 139, 75 A.2d 478 (App.Div. 1950)); and where the seller fails to refer a prospective purchaser of which he or she becomes aware to the broker during the term of the exclusive agency, but instead tells the prospective purchaser to wait to make an offer until after the listing agreement has expired. Kislak Co., Inc. v. Geldzahler, supra.
Plaintiff in this case failed to meet its burden to prove any such bad faith on the part of Kolpan. When Yun first appeared at the premises of Sunrise in October 1988, Kolpan refused to negotiate directly with him, but instead, in accordance with his contractual obligations, referred Yun to plaintiff whom Kolpan identified as his exclusive broker. Kolpan conducted no direct negotiations with Yun during the term of the six-month exclusive listing. While Kolpan did initiate direct negotiations with Yun in mid-August 1989, the exclusive term of the listing agreement had long since expired, the expiration date being March 14, 1989. *187 Kolpan was then under no contractual duty to deal through plaintiff or in any way utilize its services and, therefore, could not be found to have acted in bad faith in initiating direct negotiations without notice to plaintiff.
The failure of Yun and Kolpan to enter into a binding sales contract prior to the expiration on September 14, 1989, of the six-month extension period was not the result of any bad faith on the part of Kolpan. Kolpan had gone to his attorney promptly after he and Yun reached oral agreement on price, the cash down payment and the amount of the purchase money mortgage and requested Tobin to draw agreements for the sale of the business and property as promptly as possible and to forward those agreements to Yun's attorney. Tobin promptly prepared and put initial drafts of those contracts in the mail to Yun's then attorney, Manzione, on September 5, 1989, nine days prior to the expiration of the extension period.
While Kolpan and Yun had reached an oral understanding as to the price and terms referred to above, a significant number of issues remained unresolved and required the assistance of counsel before the parties could reach final agreement. After Manzione withdrew as counsel for Yun, it took Yun more than a week to retain other counsel. It was not until sometime in mid September 1989 that Yun retained Fink. Yun informed Fink of a number problems he wanted resolved before he would sign the contracts. The building's roof was leaking and Yun wanted the roof repairs to be made by Kolpan. During their oral discussions Kolpan and Yun had not resolved the length of the purchase money mortgage or the interest rate to be paid on that mortgage. Yun wanted assurances that there would be no problems with the union when he took over the business; that there were no environmental problems with the premises; and that the zoning ordinances would allow him to rent the upstairs apartments and put in a new store front. Yun was also concerned with the structural soundness of the main support beam for the building and wanted Kolpan to make any structural repairs needed for the safety of the building. *188 Yun also wanted Kolpan to place the building's electrical, plumbing, heating and air conditioning systems and the laundry machinery and equipment and vehicles in good working order prior to closing.
Negotiations between counsel and the parties on these matters continued until shortly before preparation of the final contracts executed on October 11, 1989. While Yun did not achieve all of his negotiation goals on these issues, the final contracts reflect the compromises reached by the parties on each of these issues.
The court concludes that Manzione's withdrawal and the retention of new counsel by Yun and negotiations between counsel and the parties on the matters referred to above, rather than any bad faith by Kolpan, delayed the parties from reaching a meeting of the minds on all issues necessary to conclude the transaction until several weeks after expiration of the extension period contained in the listing agreement. There was no evidence whatsoever that Kolpan was in any way responsible for the delays between September 5, 1989, when Tobin forwarded proposed drafts of the initial contracts, and October 11, 1989, when final contracts were signed, or that he caused or encouraged those delays, or that he conspired with Yun in any way to defeat plaintiff's claim for a commission.
For the foregoing reasons, the court will enter judgment for defendant dismissing the complaint with prejudice. In view of the result reached, the court need not discuss other defenses raised by counsel for defendant, including those based on the statute of frauds, misrepresentation and fraud by plaintiff, release, and accord and satisfaction, other than to state that the court regards those defenses to be completely lacking in merit.
NOTES
[1] Plaintiff in this case has neither pleaded nor attempted to prove a claim against defendant Kolpan or the buyer Yun of tortious interference with its prospective economic advantage or with its exclusive listing contract. Claims of tortious interference against both buyers and sellers of real estate, based upon proof of unlawful, intentional interference with the broker's reasonable expectation of earning a commission and a reasonable probability that the broker would have received such commission had there been no interference have been recognized frequently by our courts. E.g., Harris v. Perl, 41 N.J. 455, 197 A.2d 359 (1964); Louis Schlesinger Co. v. Rice, 4 N.J. 169, 180, 72 A.2d 197 (1950); Louis Kamm, Inc. v. Flink, 113 N.J.L. 582, 586, 175 A. 62 (E. & A. 1934); Myers v. Arcadio, Inc., 73 N.J. Super. 493, 180 A.2d 329 (App.Div. 1962); Brenner & Co. v. Perl, supra; Geo. H. Beckmann, Inc. v. Charles H. Reid & Sons, Inc., 44 N.J. Super. 159, 130 A.2d 48 (App.Div. 1957); McCue v. Deppert, 21 N.J. Super. 591, 91 A.2d 503 (App.Div. 1952).