SAMUEL NICHOLS, INC. *vs.* FRANCIS J. MOLWAY, JR. No. 87-52. November 25, 1987. *Contract,* With broker, Performance and breach, Unilateral. *Broker,* Commission.

If an exclusive brokerage engagement is to be binding, it must be a bilateral contract, i.e., it must, through an exchange of promises, require performance by broker and seller. *Bump* v. *Robbins,* 24 Mass. App. Ct. 296, 304-305 (1987), and cases cited. The question presented is whether, within the corners of an agreement signed by the parties, the broker in the instant case made an enforceable promise which bound it to expend efforts on the property owner's behalf. We decide that it did and affirm the judgment entered below.

Exclusive broker arrangements, i.e., an agreement that during a specified time period the designated broker will be the sole agent authorized to find a buyer, are commonly made and thought by property owners to be likely to induce a maximum effort by the broker. See Mendler, Massachusetts Conveyancers' Handbook § 2:1 (3d ed. 1984). Cf. *Julius Tofias & Co.* v. *John B. Stetson Co.,* 19 Mass. App. Ct. 392, 396-397 (1985). We recently had occasion, in *Bump* v. *Robbins,* 24 Mass. App. Ct. at 303-305, to review the authorities concerning exclusive broker agreements. Not only is it necessary to express unambiguously the intent to grant an exclusive agency, *id.* at 304, but the broker must be more than a passive recipient of the grant of exclusive agency; the broker must agree to do something, such as advertising the property and making diligent effort to find a buyer on the seller's terms. An example of a binding exclusive agency agreement appears in *Julius Tofias & Co.* v. *John B. Stetson Co.,* 19 Mass. App. Ct. at 392 n.1. See also the more carefully considered text which appears in Mendler, Massachusetts Conveyancers' Handbook at 490. Compare *Bartlett* v. *Keith,* 325 Mass. 265 (1950), in which the agreement said merely:

"June 16, 1947, Exclusive sale of property. #26 Prospect St., West Bridgewater[,] Mass., to my agent Florence M. Bartlett. We are

asking $12,000 (will take as low as $11,000). She is to have exclusive sale of same — for 90 days. [Sgd.] Phyllis L. Keith."[1]

That agreement, by reason of its failure to require any performance from the broker, was held a unilateral contract which the owner might terminate at will, provided the broker had not before then achieved a sale, and thereby delivered the consideration. See also *Des Rivieres* v. *Sullivan,* 247 Mass. 443, 445-448 (1924), in which the agreement held to be unilateral read as follows:

> "I hereby employ W. F. Des Rivieres as exclusive agent to sell my house at 389 and 391 Salem Street, Medford, Mass., for a price of not less that [$12,000] and I agree to pay him a regular broker's commission, in any event, when a sale is consummated.
> "W. F. Des Rivieres is to do his advertising and showing of the property at his own expense."

In the case now before us, the defendant, Molway, had for sale a property which had been used as, and was particularly suitable for use as, a restaurant. Samuel Nichols, a principal officer of the plaintiff, solicited employment as a broker by slipping a business card under the front door of Molway's vacant restaurant. After some preliminaries, the parties met at the locus on March 18, 1980, and both signed an agreement which, so far as pertinent, read as follows:

> "Date March 18, 1980
>
> To Samuel Nichols, Inc.
>
> In consideration of your listing for sale and undertaking to find a purchaser for the real estate described on the reverse side of this card, [2] . . . for the price specified on the reverse side hereof, or for a price and upon terms acceptable to me, I hereby grant and give to you the sole and exclusive right to sell the same for a period of 90 days from this date . . . ."[3]

---

[1] This particular agreement was construed as an exclusive right of sale, rather than an exclusive agency. See *Bump* v. *Robbins,* 24 Mass. App. Ct. at 304 n.6, as to the distinction.

[2] The reverse side of the document contained the street address; that the property contained 16,000 square feet at the corner of Dix Street and Dorchester Avenue; that the property was heated by oil, had all new plumbing, new electrical wiring, a dishwasher, grill, dining room tables and chairs, and so forth.

[3] The balance of the agreement establishes a basis for a commission and makes the agreement terminable upon thirty days' written notice once the ninety-day period has expired.

One might wish for explication of the phrase "undertaking to find a purchaser," but it surely connotes some expenditure of energy or money on advertising such as a broker of ordinary industry might be expected to put forth. The phrase is not significantly different from the "In consideration of your listing our [property] and your promise to make reasonable efforts to sell same . . ." taken by us as binding in *Julius Tofias & Co.* v. *John B. Stetson Co.,* 19 Mass. App. Ct. at 392. See also *Coan* v. *Holbrook,* 327 Mass. 221, 223 (1951); *John T. Burns & Sons* v. *Brasco,* 327 Mass. 261, 263 (1951).

As matters transpired, the plaintiff did place an advertisement in *The Boston Globe* on three occasions and placed a "for sale" sign on the defendant's property. That activity provoked an inquiry from Edward Lai, to whom James Nichols, an employee of the plaintiff, showed the premises in late May, i.e., during the period of the exclusive established by the agreement.

On April 30, 1980, the defendant had attempted to cancel the brokerage agreement. Had the contract, as the defendant argues, been unilateral, the defendant could have done so because the broker had not by then produced a buyer. See *Des Rivieres* v. *Sullivan,* 247 Mass. at 446-447; *Elliott* v. *Kazajian,* 255 Mass. 459, 462-463 (1926); *Walsh* v. *Grant,* 256 Mass. 555, 557 (1926); v. *Bartlett* v. *Keith,* 325 Mass. at 267-268; *Lattuca* v. *Cusolito,* 343 Mass. 747, 751-752 (1962); *Bump* v. *Robbins,* 24 Mass. at 305. As we have said, however, the contract was bilateral and binding; the owner could not unilaterally extricate himself from the arrangement without cost.[4]

On June 25, 1980, Lai entered into a purchase and sale agreement to buy the defendant's property. That was after the expiration of the "exclusive." The plaintiff had played no part in the negotiations leading up to the transaction. Title passed to Lai on July 30, 1980. The agreement between the owner and the broker provided, however, that if the real estate were "sold during the term of this contract or within ninety days after the expiration thereof to any person . . . to whom [the] property was . . . shown . . . during the term hereof . . . I agree to pay unto you a commission in accordance with the schedule of the Boston Real Estate Board." Under the agreement, the broker did not need to be the predominating cause of the sale. See *Julius Tofias & Co.* v. *John B. Stetson Co.,* 19 Mass. App. Ct. at 396-397. The broker was entitled to its commission.

*Judgment affirmed.*

*Richard A. Magri* for the defendant.
*Abraham Newman* for the plaintiff.

---

[4] Descriptive labels such as "bilateral" and "unilateral" are far from universally self-defining and their utility can be limited by context. In cases of this kind, however, the terms have been much used as convenient tools of analysis.