## UPPER CAPE REALTY CORPORATION *vs.* ROGER C. MORRIS & others.[1]

No. 99-P-1549.

Plymouth. September 7, 2001. - October 24, 2001.

Present: BROWN, MASON, & DOERFER, JJ.

*Contract,* Sale of real estate. *Real Property,* Purchase and sale agreement. *Broker,* Commission.

In an action on a claim for breach of an exclusive brokerage agreement, the broker was entitled to the commission provided by an agreement giving it the exclusive right to sell the defendant's property during the term thereof where, although there was no sale of the property prior to the end of the term, an extension clause of the agreement provided that the broker would be entitled to a commission if, within a "reasonable term" after expiration of the agreement, the property was sold to a prospect whom the broker had "introduced" to the seller, and where the fact that the buyer first became interested in purchasing the property as a result of seeing the broker's sign on the property was enough, as a matter of law, to satisfy the "introduction" requirement contained in the extension clause. [58-61]

In an action by a broker against the seller of real property and others for violation of G. L. c. 93A, the judge correctly concluded that there was insufficient evidence to warrant a finding that the seller had acted in bad faith in terminating his agreement with the broker and in dealing directly with a prospective buyer, and the broker's claim under c. 93A was properly dismissed; further, the broker's claims against the buyer of the property and his builder under c. 93A were properly dismissed, where there was no showing that either the buyer or his builder even knew of the terms of the agreement between the broker and seller, let alone that they knowingly induced the seller to breach the terms of his agreement with the broker through unfair or deceptive practices. [61]

CIVIL ACTION commenced in the Wareham Division of the District Court Department on May 1, 1985.

Following removal to the Superior Court Department,

[1]Gary Lucier and Frederick V. Rasch III, individually and as trustees of the R. L. L. Realty Trust.

subsequent remand to the District Court Department for trial, and retransfer to the Superior Court Department, the case was heard by *Richard F. Connon*, J.

*Lawrence R. Glynn* for the plaintiff.

*Richard T. Moses* for the defendants.

MASON, J. After a bench trial in Superior Court, judgment was entered for the defendant, Roger Morris, dismissing the claim of the plaintiff, Upper Cape Realty Corporation (Upper Cape), against him for breach of an exclusive brokerage agreement. The judgment also dismissed Upper Cape's additional claims against Morris and others for violation of G. L. c. 93A. We reverse the judgment for Morris on Upper Cape's claim against him for breach of the brokerage agreement and affirm the judgment insofar as it dismissed Upper Cape's c. 93A claims.

*The facts.* We summarize the facts from the judge's findings and admissions by the parties. Morris was a resident of Florida and was engaged in the real estate brokerage business there. He also had an office in Mattapoisett and was trustee of a trust owning a parcel of land located on Head of the Bay Road in Bourne. The land consisted of thirteen residential building lots at the front of the property, and additional acreage at the back of the property. Morris advertised the front lots for sale and, as of June or July, 1983, had sold only one of the lots.

Some time in June or July, 1983, James Crabtree, a licensed salesperson with Upper Cape, contacted Morris's daughter with respect to obtaining a listing of the remaining twelve residential building lots on the property, and subsequently arranged to meet with Morris with respect to the matter at Morris's office in Mattapoisett. The meeting occurred on August 5, 1983.

At the meeting, Crabtree presented Morris with a letter, dated August 4, 1983, stating that Upper Cape believed that Morris had an "extremely marketable piece of property" and that, subject to Morris's granting it an "exclusive right to sell," Upper Cape would commence "a vigorous sales effort." The letter further stated that Upper Cape intended to post conspicuous signs at the site and make a brochure readily available through its offices. The letter further stated that "[i]n addition, advertising in newspapers will consist at a minimum of two each month

in the Boston Globe, four each month in the Cape Cod Times, and three in the Old Colony Group (five papers)."

Crabtree also gave Morris a document entitled "Vacant Land Listing Form" which, after setting forth various characteristics of the property, provided:

> "In consideration of reasonable effort to be made by Upper Cape Realty, the Seller agrees to give the Broker the exclusive right to sell the Property described above for the price of [$233,000] for a period of 180 days and continuing thereafter until terminated by either party by thirty days written notice to the other . . . . If the above Property is sold within a reasonable term after expiration of this agreement (or before) to a prospect which Broker has introduced to the Property or to the Seller, then Seller agrees that Upper Cape Realty Corp. shall be entitled to a commission of ten percent (10%) of the gross sale price, or a minimum commission of Five Hundred Dollars ($500.00), whichever is greater."

After reviewing the August 4 letter, Morris asked Crabtree what would happen if he sold the property to persons he had shown it to prior to entering into the agreement. Crabtree responded that Morris would retain the right to sell the property to any such persons without paying a commission to Upper Cape and wrote in an addendum to that effect. Morris then signed the agreement.

Upper Cape then began to market the property. It distributed brochures and also caused various "for sale" signs to be posted at the site. It also caused several advertisements to be placed in the newspapers referred to in the August 4 letter although, particularly after the first few months, not as many as the letter had indicated. It also began showing the property but received only one or two offers for certain of the lots and none that was acceptable to Morris.

The defendant Lucier resided in Buzzards Bay and frequently hunted on or near Morris's property. He was engaged in the auto body repair business and had previously developed some property. In August or early September, 1984, Lucier noticed Upper Cape's "for sale" sign on Morris's property and became interested in purchasing the property. Lucier, however, did not

want to deal with Upper Cape because he had had prior dealings with Upper Cape of a nature not disclosed by the record. He accordingly checked the local tax records and, after determining that Morris was the owner of the property, he began making calls to Morris's office inquiring about the property.

In the meantime, on September 1, 1984, the defendant Rasch, who resided in Plymouth and was employed by CDP Industries, a partnership engaged in buying land and building homes on · speculation, submitted an offer of $10,000 for one of the lots on the property. Although Morris rejected the offer, Mary MacDonald, an agent employed by Upper Cape, arranged a meeting between Rasch and Morris at Upper Cape's office for September 22, 1984.

Morris went to Upper Cape's office on September 22, and met there with both MacDonald and Crabtree but not with Rasch, who failed to appear at the meeting. Morris told MacDonald and Crabtree at that time that Lucier had been calling him about the property, but he did not know who Lucier was. Both MacDonald and Crabtree stated to Morris that Lucier was "bad news," and he should stay away from him.

Morris nevertheless met with Lucier in response to his ongoing calls about the property. Lucier told Morris that he would be willing to pay him $200,000 for all the lots on the property, but he would not buy a "toothpick" from Upper Cape. Accordingly, on November 5, 1984, without disclosing to Upper Cape what he was doing or seeking its assistance, Morris sent Lucier a proposed purchase and sale agreement providing for the sale of the lots to Lucier at the $200,000 price Lucier had quoted. In an accompanying cover letter, Morris stated:

> "Enclosed is a purchase and sale[] agreement which has been made up rather quickly. It should provide you with the necessary information needed for you to acquire financing. This agreement must be implemented no later than Wednesday, November 14, 1984. As you probably know, several other individuals are extremely interested in this property."

Lucier never signed or returned the proposed purchase and sale agreement to Morris, but rather stated to Morris that his handshake or word was "good enough." Subsequently, on

December 11, 1984, Lucier met with Morris's representative, Lawrence O'Connor, and gave O'Connor $20,000 in cash as a down payment on the property. O'Connor gave Lucier a receipt, stating that a purchase and sale agreement was to be signed no later than January 15, 1984, unless "agreed by both parties to extend," and that "[i]f agreement is not reached, all monies are to be returned."

After making his deposit, Lucier asked Rasch if he would help him build houses on the lots.[2] Rasch agreed to do so. Lucier then asked Morris to obtain building permits on two of the lots so that he and Rasch would be able to begin foundation work "before wintertime really set in and froze." Morris agreed to do so and subsequently obtained such permits listing Rasch as the builder.

At the time he sent the proposed purchase and sale agreement to Lucier, Morris believed that his brokerage agreement with Upper Cape had terminated automatically at the end of its initial 180-day term in January, 1984. Subsequently, however, he reviewed the agreement and noted that it required a written notice of termination. Accordingly, on December 7, 1984, Morris sent a letter to Upper Cape stating:

> "Although we have felt that your agency with regards to the sale of the Bourne Land terminated at the expiration of the original 180 day period, we are now giving you formal notice in accordance with the terms of your agency agreement to cancel this agreement as of December 7, 1984.

> "We would appreciate it if you continued your efforts to sell the property but no longer can grant you the exclusive right to do so."

On January 21, 1985, Morris caused a deed to the property to be delivered to Lucier in exchange for the remainder of the $200,000 purchase price that had previously been specified in the deposit receipt. On that same date, Lucier caused a half interest in the property to be transferred to Rasch for $1 and a

---

[2]Lucier knew Rasch because Rasch had previously worked on an addition to Lucier's home in Buzzards Bay.

verbal commitment by Rasch to help Lucier build houses on the property.

*Discussion.* We accept the judge's findings of fact unless "clearly erroneous." *Kendall* v. *Selvaggio,* 413 Mass. 619, 620 (1992). His legal conclusions drawn from those facts, however, are subject to de novo review. *Id.* at 621. See *Bowman* v. *Heller,* 420 Mass. 517, 522 n.6 (1995).

1. *Breach of brokerage agreement.* Upper Cape contends that it was entitled to the commission provided by its agreement with Morris because the agreement gave it the exclusive right to sell Morris's property during the term of the agreement, and Morris in fact sold the property to Lucier before the end of such term. Upper Cape further contends that, even if Morris sold the property to Lucier after he had effectively terminated the agreement, Upper Cape was still entitled to its commission under the extension clause contained in the agreement because it had introduced Lucier to the property.

Citing *Bartlett* v. *Keith,* 325 Mass. 265 (1950), the trial judge rejected this claim, concluding that Upper Cape's agreement with Morris was only a unilateral contract that was revocable by Morris at any time before Upper Cape had produced a customer who was able, willing, and ready to purchase the property on Morris's terms. In *Bartlett* v. *Keith,* however, the parties agreed only that the broker would receive a commission if she produced a customer that was able, willing, and ready to purchase the property at issue. *Id.* at 267-268. Here, by contrast, Upper Cape explicitly agreed to make a "reasonable effort" to sell Morris's property. In light of this language, we agree with Upper Cape that its agreement with Morris was bilateral and irrevocable during its term. See *Samuel Nichols, Inc.* v. *Molway,* 25 Mass. App. Ct. 913, 914-915 (1987). See also *Julius Tofias & Co.* v. *John B. Stetson Co.,* 19 Mass. App. Ct. 392, 396-397 (1985).

We do not think, however, that there was a sale of the property to Lucier prior to the end of such term. The parties do not dispute that the agreement was terminated on or about January 7, 1985, in accordance with Morris's letter to Upper Cape dated December 7, 1984. Prior to that time, Lucier had had certain discussions with Morris, and had made a $20,000 cash

deposit toward purchase of the property, but he had refused to sign the purchase and sale agreement which Morris was insisting upon, and he had not taken title to the property. In these circumstances, we do not think that there was any effective sale of the property until January 21, 1985, when Morris delivered, and Lucier accepted, the deed to the property.

We nevertheless agree that Upper Cape was entitled to a commission if the extension clause of its agreement with Morris was applicable. That clause provided that Upper Cape was entitled to a commission if, within a "reasonable term"[3] after expiration of the agreement, the property was sold to a prospect whom Upper Cape had "introduced" to the property or to Morris.

The word "introduce" as used in an extension clause such as the one involved in the present case does not require that the broker be the predominant cause of a sale. See *Julius Tofias & Co.* v. *John B. Stetson Co.*, 19 Mass. App. Ct. at 396-397. Rather, it requires only that the broker's actions have "at least some minimal causal connection with the sale or, in other words, be in the 'chain of causation' leading to the sale." *Id.* at 397. A broker "introduces" a purchaser to a principal "if, through any means [the broker] uses to attract attention, the purchaser is led to the principal." Restatement (Second) of Agency § 448 comment d, at 357 (1958).

In the instant case, the judge explicitly found that Lucier first became interested in purchasing Morris's property as a result of seeing Upper Cape's "for sale" sign on the property.[4] More specifically, the judge found that "Lucier had hunted on the property and had seen the signs placed there by Upper Cape," and that "[b]ecause he did not want to deal with Upper Cape, he checked the tax records to determine the owner." We think that, as a matter of law, this was enough by itself to satisfy the "introduction" requirement contained in the extension clause of the exclusive brokerage agreement. Compare *Samuel Nichols,*

---

[3]The question of what constitutes a reasonable term has not been made an issue on this record.

[4]Morris has made no claim that this finding is clearly erroneous. While Lucier testified that he also observed another sign on the property, he did not describe what that sign said.

*Inc.* v. *Molway*, 25 Mass. App. Ct. at 915 (broker entitled to commission under extension clause even though it did not participate in negotiations leading to sale where its advertisements initially attracted purchaser to property and its agent showed property to buyer during period of exclusive agreement). Indeed, any other result would be inconsistent with the purpose of such an extension clause, which is to "afford the broker some measure of protection if the [owner's] property is sold to a person with whom the broker, prior to the expiration of the term of the listing agreement, had some form of dealing described in the agreement." *Julius Tofias & Co.* v. *John B. Stetson Co.*, *supra* at 396.

We recognize that, as Morris points out, Upper Cape's representatives stated that Lucier was "bad news" and that Morris should stay away from Lucier. Morris further testified, however, that he ignored Upper Cape's advice and dealt directly with Lucier without informing Upper Cape what he was doing. In these circumstances, Upper Cape did not interfere with Morris's sale of his property to Lucier after Upper Cape had effectively "introduced" Lucier to the property. Rather, it was Morris himself who effectively precluded Upper Cape from having any further involvement in the matter.

Morris further contends that, even if Upper Cape did introduce Lucier to his property within the meaning of the extension clause to the agreement, Upper Cape is precluded from enforcing the agreement due to its own failure to comply with the agreement. Morris refers specifically to the alleged failure on the part of Upper Cape to comply with the newspaper advertising schedule set forth in the August 4, 1983, letter that Crabtree gave to Morris at the time the parties entered into the exclusive brokerage agreement.

The judge explicitly found, however, that the August 4 letter was a proposal only and was not intended to be part of the parties' exclusive brokerage agreement. Nothing has been made to appear that would require us to conclude that the judge's finding was clearly erroneous.[5] Morris's claim that Upper Cape

_____

[5]We recognize that Crabtree testified that he "considered" his August 4 letter to be part of the exclusive brokerage agreement. The judge, however, was

breached the agreement by failing to comply with the terms of the August 4 letter must therefore be rejected.

We therefore conclude that Upper Cape was entitled to the commission provided by its agreement with Morris.

2. *Chapter 93A claims.* The judge concluded that there was insufficient evidence to warrant a finding that Morris had acted in bad faith in terminating his agreement with Upper Cape and dealing directly with Lucier. The judge noted particularly that Upper Cape had not produced a serious purchaser (other than Lucier, who expressly refused to deal with Upper Cape) in sixteen months, and still had not produced such a purchaser on the date the property was sold to Lucier on January 21, 1985.

While Upper Cape contends that there was evidence that Morris actually conspired with Lucier to deprive Upper Cape of its commission and obtain part of the commission for himself, it has not shown, or even contended, that the judge's contrary conclusion was clearly erroneous. Its claim against Morris for violation of G. L. c. 93A was therefore properly dismissed.

Upper Cape's c. 93A claims against Lucier and Rasch were also properly dismissed. Upper Cape made no showing that Lucier or Rasch even knew what the precise terms of Upper Cape's agreement with Morris were, let alone that they knowingly induced Morris to breach those terms through unfair or deceptive practices, or otherwise engaged in conduct violative of G. L. c. 93A. See *Bump* v. *Robbins*, 24 Mass. App. Ct. 296, 309, 313-314 (1987).

*Conclusion.* The judgment for Morris on the count against him for breach of the exclusive brokerage agreement is reversed and judgment is to enter in favor of Upper Cape on that count. Insofar as the judgment dismissed the remaining counts of Upper Cape's complaint brought against the defendants under G. L. c. 93A, it is affirmed.

*So ordered.*

---

not required to accept this testimony, which was contradicted by the terms of the exclusive brokerage agreement itself. See *Robert Indus., Inc.* v. *Spence*, 362 Mass. 751, 753-754 (1973) (express terms of written agreement may not be varied by parol evidence).