NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

22-P-630                                          Appeals Court


   BOSTON CAPITAL FUNDING, LLC  vs.  BEK WINCHESTER WINNING FARM
                        LLC & another.[1]


                        No. 22-P-630.

   Middlesex.      September 7, 2023. – November 29, 2023.

            Present:  Meade, Hershfang, & D'Angelo, JJ.


Contract, Performance and breach, Offer and acceptance,
     Misrepresentation.  Consumer Protection Act, Unfair act or
     practice.  Real Property, Attachment.  Bond, To dissolve
     attachment.  Practice, Civil, Summary judgment, Attachment.


     Civil action commenced in the Boston Municipal Court
Department on October 21, 2019.

     Civil action commenced in the Superior Court Department on
February 18, 2020.

     After consolidation, the case was heard by Cathleen E.
Campbell, J., on motions for summary judgment, and a motion to
discharge a bond of dissolution was heard by Christopher K.
Barry-Smith, J.


     Shannon F. Slaughter for the plaintiff.
     Richard Joyce for the defendants.



_____

     [1] Eric M. Katz.

D'ANGELO, J.  This case arises from the efforts of defendant BEK Winchester Winning Farm LLC (BEK) to obtain financing to develop land in Winchester (project).  In 2017, BEK contracted with Newmark Real Estate of Massachusetts, LLC, doing business as Newmark Grubb Knight Frank (Newmark), to procure financing for the project.  Then, in 2018, BEK signed an agreement with the plaintiff, Boston Capital Funding, LLC (BCF), purporting to grant BCF "exclusive authorization" to act on BEK's behalf in procuring equity for the same project.  Later in 2018, Newmark procured financing for the project, at which point BEK informed BCF that its services were no longer needed.  BCF appeals from (1) a summary judgment dismissing its claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of G. L. c. 93A and (2) an order discharging a surety bond.  We conclude that BCF did not have a binding, exclusive right to act on BEK's behalf in procuring equity for the project, and that summary judgment properly entered on BCF's contract-based claims.  However, on BCF's c. 93A claim, where there is evidence from which one could conclude that BEK enticed BCF to work on its behalf by intentionally misrepresenting the exclusivity of BCF's authorization, summary judgment should not have entered.  We further conclude that there was no abuse of discretion in the order discharging the surety bond.

Background.[2]  BEK was formed for the purpose of purchasing and developing land in Winchester.  Pursuant to an agreement with the seller of the land, BEK had to provide proof of financing by April 12, 2018, although that deadline was later extended for several months.  As noted, this case arises from BEK's efforts to obtain the financing.

On April 4, 2017, BEK entered into a "Commercial Financing Procurement Fee Agreement" with Newmark (Newmark agreement).  BEK granted Newmark "the exclusive right to arrange Commercial Financing" for eighteen months, and Newmark agreed to "use its commercially diligent efforts to procure Commercial Financing from any Referral Source."  BEK agreed to pay Newmark a flat fee of $200,000 if it successfully procured financing.

By April 2018, Newmark had not acquired any financing for the project.  Thus, on April 30, 2018, before the expiration of the Newmark agreement, BEK entered into a separate "Engagement Agreement" with BCF (engagement agreement).  BEK "grant[ed] [BCF] exclusive authorization to act on [BEK's] behalf in the procurement of Equity for the [project]."  The "authorization include[d] but [was] not limited to the sharing of personal and business financial information of [BEK] with any proposed Equity

_____

[2] We take the facts, construed in the light most favorable to BCF, from the summary judgment record.  See Epstein v. Board of Appeal of Boston, 77 Mass. App. Ct. 752, 756 (2010).

Participant deemed fit by [BCF]."  BEK agreed to pay BCF three percent "of the procured Equity amount," which was both "earned" and "paid at Funding of the Equity."  BEK also agreed to pay BCF "a retainer fee in the amount of $2,500.00," which "[was to] be credited to [BEK] . . . at the closing."  In reliance on the grant of "exclusive authorization," BCF forwent other opportunities and exerted efforts to procure equity for the project.  On or about June 3, 2018, BEK sent BCF an "Offering Document" stating that Newmark had been granted the right to procure equity for the project, but Kevin Hern, the principal of BCF, did not read the entire document and did not see the provision about Newmark.

On June 18, 2018, Newmark procured four million dollars in financing for the project from Novaya Real Estate Ventures (Novaya).[3]  The next day, BEK sent BCF an e-mail message stating that BEK had secured financing for the project, requesting the return of the $2,500 retainer, and suggesting that the parties "find something else we can do together."  BCF did not return the $2,500, and no commission was ever paid to BCF.

---

[3] The parties dispute whether the financing was in the form of equity.  BEK argues that the financing actually procured was debt financing in the form of a loan, and that the summary judgment on BCF's contract-based claims could be affirmed on this alternative basis.  BCF argues that the funding was effectively equity financing.  We need not, and do not, address these arguments.

BCF asserted claims against BEK and BEK's principal, Eric M. Katz, for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of G. L. c. 93A. The parties submitted cross motions for summary judgment, and a Superior Court judge denied BCF's motion but allowed BEK's motion. A summary judgment entered, and BCF appeals.[4]

Discussion. 1. Standard of review. "Summary judgment is appropriate where there is no material issue of fact in dispute and the moving party is entitled to judgment as a matter of law." HSBC Bank USA, N.A. v. Morris, 490 Mass. 322, 326 (2022). See Mass. R. Civ. P. 56 (c), as amended, 436 Mass. 1404 (2002). "Our review of a decision on a motion for summary judgment is de novo" (citation omitted). HSBC Bank USA, N.A., supra. "In

---

[4] We note that, prior to this proceeding, Katz filed an action in the Boston Municipal Court (BMC) against BCF and Hern seeking $2,500 in damages for the retainer not returned. BCF requested that the two actions be consolidated in the Superior Court, and that motion was allowed. The BMC case was transferred to the Superior Court and closed. Katz's claim against BCF and Hern, and a counterclaim originally filed in the BMC action, appear to remain pending. In these circumstances, under our case law, the summary judgment on BCF's claims against BEK was not a final, appealable judgment. See Trenz v. Family Dollar Stores of Mass., Inc., 73 Mass. App. Ct. 610, 613 (2009). But see Hall v. Hall, 138 S. Ct. 1118, 1131 (2018) (cases consolidated under Fed. R. Civ. P. 42 [a] "retain their separate identities at least to the extent that a final decision in one is immediately appealable by the losing party"). However, where "[d]ismissal of the appeal would serve no purpose and might require the parties to return to reargue issues already briefed and argued" (citation omitted), Commercial Wharf E. Condominium Ass'n v. Boston Boat Basin, LLC, 93 Mass. App. Ct. 523, 532 n.20 (2018), we exercise our discretion to turn to the merits.

instances of cross motions, the appellate court assesses the factual materials in the light most favorable to the unsuccessful opposing party." Epstein v. Board of Appeal of Boston, 77 Mass. App. Ct. 752, 756 (2010). "The court will draw all permissible inferences and resolve any evidentiary conflicts in that party's favor." Id.

2. Breach of contract. BCF argues that BEK committed a breach of contract, entitling BCF to expectation damages equaling three percent of the amount of the financing procured by Newmark. We conclude that the engagement agreement between BEK and BCF was in the form of a revocable offer that BEK would pay BCF a commission if BCF procured equity for the project. The language purporting to grant BCF "exclusive authorization" did not alter the nature of the transaction. Where BEK permissibly revoked its offer before BCF procured any equity, summary judgment properly entered on BCF's breach of contract claim.[5]

The issue presented turns on the distinction between unilateral and bilateral contracts. "Traditionally, contract law divides offers into one of two categories: (1) offers

---

[5] BCF's claim is based on the idea that BEK's alleged breach deprived BCF of the opportunity to find a ready and willing investor, entitling BCF to expectation damages under Huang v. Ma, 491 Mass. 235, 241-242 (2023), not that BCF actually produced a ready and willing investor, see Tristram's Landing, Inc. v. Wait, 367 Mass. 622, 629 (1975).

looking to a bilateral contract, and (2) offers looking to a unilateral contract."  H.J. Alperin, Summary of Basic Law § 5:12 (5th ed. 2014) (Alperin).  "[A]n offer for a bilateral contract requires a promise from the offeree in order to form a binding contract," and the promise operates as a manifestation of mutual assent and consideration.  2 R.A. Lord, Williston on Contracts § 6.2 (4th ed. 2023).  With respect to an offer for a unilateral contract, the offeree must perform an act to form a binding contract, and the act operates as the manifestation of mutual assent and consideration.  See id.  Until the offeree performs the act, thereby providing mutual assent and consideration, the offeror may revoke the offer at any time.  1 R.A. Lord, Williston on Contracts § 5.15 (4th ed. 2022).[6]

An offer for a unilateral contract can work a hardship to the offeree, who may expend resources to perform the act only to have the offer revoked.  See 1 Williston on Contracts, supra at

---

[6] In some jurisdictions, the offeror is bound once the offeree partially performs.  See 1 Williston on Contracts, supra at § 5.15.  However, BCF does not argue that we should apply that rule here, and the argument is therefore waived.  See Mass. R. A. P. 16 (a) (9) (A), as appearing in 481 Mass. 1628 (2019).  Regardless, the Supreme Judicial Court has held that "an acceptance of an offer must be in accordance with its terms, that is, by full performance by the offeree, in order that a contract may come into existence."  Northampton Inst. for Sav. v. Putnam, 313 Mass. 1, 7 (1943).  See Alperin, supra at § 5:11 ("Massachusetts does not recognize [the rule that commencement of performance makes the offer irrevocable] . . . because an offer for a unilateral contract may be accepted only by the offeree's full performance").

§ 5.15.  To mitigate the possibility of hardship, offerees sometimes seek the exclusive right to perform the act, as BCF did here.  However, the mere statement that the offeree has the exclusive right to perform the act does not alter the fundamental revocable nature of an offer for a unilateral contract.  See Des Rivieres v. Sullivan, 247 Mass. 443, 446-447 (1924).  See also Bump v. Robbins, 24 Mass. App. Ct. 296, 303-304 (1987).  To make the exclusivity binding, the parties must enter into a bilateral contract whereby the offeree makes a promise.  See Samuel Nichols, Inc. v. Molway, 25 Mass. App. Ct. 913, 913 (1987).  See also Bump, supra.

Under our case law, the above principles have often been discussed in the context of brokerage agreements involving commissions for the sale of property.  In Des Rivieres, 247 Mass. at 445, the parties signed an agreement stating that (1) the broker was the "exclusive agent to sell [the owner's] houses," (2) the owner "agree[d] to pay [the broker] a regular broker's commission, in any event, when a sale [was] consummated," and (3) the broker was "to do his advertising and showing of the property at his own expense."  Because the broker did not promise to do anything in exchange for the right to be the exclusive agent, and therefore did not provide any consideration for that right, the owner's offer to pay the broker a commission was construed as a revocable offer.  See id.

at 448.  See, e.g., <u>Bartlett</u> v. <u>Keith</u>, 325 Mass. 265, 267 (1950); <u>Huang</u> v. <u>RE/MAX Leading Edge</u>, 101 Mass. App. Ct. 150, 163-164 (2022), <u>S.C.</u>, 491 Mass. 235 (2023).

In contrast, in <u>Samuel Nichols, Inc</u>., 25 Mass. App. Ct. at 914, the owner agreed that, "[i]n consideration of [the broker's] listing for sale and undertaking to find a purchaser for the real estate," the owner gave the broker "the sole and exclusive right to sell the same."  Through this language, the broker promised to list the real estate for sale and undertake to find a purchaser.  See <u>id</u>.  That promise served as consideration for the right to be the exclusive agent, and the parties successfully entered into a bilateral contract.  See <u>id</u>. See also, e.g., <u>John T. Burns & Sons, Inc</u>. v. <u>Brasco</u>, 327 Mass. 261, 261-263 (1951) ("in consideration of [broker's] agreement to use all reasonable efforts," brokerage agreement was exclusive); <u>Upper Cape Realty Corp</u>. v. <u>Morris</u>, 53 Mass. App. Ct. 53, 55, 58 (2001) (similar); <u>Julius Tofias & Co</u>. v. <u>John B. Stetson Co</u>., 19 Mass. App. Ct. 392, 392 & n.1 (1985) (similar). Cf. <u>Coan</u> v. <u>Holbrook</u>, 327 Mass. 221, 223 & n.1 (1951) (bilateral contract formed where broker paid one dollar and promised to use "efforts").[7]

---

[7] In other States, similar language has been held sufficient to form a bilateral contract.  See, e.g., <u>Charles B. Webster Real Estate</u> v. <u>Rickard</u>, 21 Cal. App. 3d 612, 615 (1971) (consideration consisted of promise to use "diligence" in

The difference between the language used in Des Rivieres and Samuel Nichols, Inc., may appear subtle but turns on whether the offeree was a passive recipient or whether the offeree made an affirmative promise. See Samuel Nichols, Inc., 25 Mass. App. Ct. at 913 (to form exclusive agency, "broker must be more than a passive recipient of the grant of exclusive agency; the broker must agree to do something"). In Des Rivieres, 247 Mass. at 445, while the broker agreed that any of his "advertising and showing of the property" would be at his own expense, he did not actually promise to advertise or show the property. He could have entirely forgone the opportunity to find a buyer and secure the commission. In Samuel Nichols, Inc., supra at 914, the language that the broker had the exclusive right to sell the property "in consideration" of the broker's listing the real estate and undertaking to find a buyer required the broker to perform those acts.

Applying the above principles to the facts of this case, the engagement agreement between BEK and BCF was in the form of

---

procuring buyer); Century 21 Associated Realty v. Hoffman, 503 N.W.2d 861, 866 (S.D. 1993) (consideration consisted of promise to use "best efforts" to sell property); McDonald v. Davis, 389 S.W.2d 494, 496 (Tex. Civ. App. 1965) (consideration given where broker "agreed as a part of the consideration for [principals]' giving him the exclusive right to sell . . . that he would list the property"). See also, e.g., Dixie Mill Supply Co. v. H.B. Smith Mach. Co., 128 N.J.L. 242, 245 (1942) (where plaintiff disclosed name of prospective customer in exchange for exclusive agency, bilateral contract was formed).

a revocable offer.  Only BEK made a promise, viz., that BCF's commission would be "earned" and "paid at Funding of the Equity."  In exchange, BCF did not make any promises regarding what it would do to procure the equity, and it could have entirely forgone the opportunity to procure the equity and secure the commission.[8]  It is true, as BCF notes, that the agreement specified that BCF's "authorization include[d] but [was] not limited to the sharing of personal and business financial information of [BEK] with any proposed Equity Participant deemed fit by [BCF]."  However, BCF was a passive recipient of that authorization; BCF did not affirmatively promise that it would share BEK's personal and business financial information with a proposed equity participant.[9]  In these circumstances, BCF had to perform the act (i.e., procure the equity) to form a binding contract.  Where BCF never

---

[8] Construing the facts in the light most favorable to BCF, it did not sit on the opportunity to procure equity for the project.  There is evidence that BCF produced six potential investors, and that BEK was aware of BCF's efforts.  We do not opine on whether these facts would support a claim for quantum meruit, as that issue is not before us.

[9] To the extent BCF relies on the fact that BEK paid a $2,500 retainer, the argument is unavailing because, again, BCF did not promise to do anything in exchange for receipt of the retainer.

procured any equity, summary judgment properly entered on BCF's breach of contract claim.[10]

3.  General Laws c. 93A.  The summary judgment on BCF's breach of contract claim is not determinative of whether BCF has a viable claim for violation of G. L. c. 93A.  It is true that, even had there been a breach of contract, that alone would not have amounted to a violation of c. 93A.  See Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc., 68 Mass. App. Ct. 582, 605 (2007).  However, BCF's c. 93A claim is based on other conduct:  namely, that BEK intentionally misrepresented that BCF had "exclusive authorization" to act on BEK's behalf in procuring equity for the project.  See, e.g., Kitner v. CTW Transp., Inc., 53 Mass. App. Ct. 741, 742, 748 (2002) (defendant liable for violation of c. 93 but not breach of contract).  "[T]he finding of intentional misrepresentation . . . is sufficient foundation for a finding of a c. 93A violation in a business context."  Brewster Wallcovering Co., supra.

---

[10] Likewise, there was no breach of the implied covenant of good faith and fair dealing.  The covenant of good faith and fair dealing requires "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract" (citation omitted).  Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471 (1991).  Here, BEK had the right to revoke its offer, and that revocation therefore did not "destroy[] or injur[e] the right of [BCF] to the fruits of the contract."  Id.

BCF made a sufficient showing of an intentional misrepresentation to survive summary judgment.  Construing the facts in the light most favorable to BCF, as we must, BEK was under a deadline to obtain financing.  As that deadline approached -- and Newmark still had not procured the financing -- BEK reached out to BCF.  However, instead of being upfront about the circumstances and disclosing that BCF was in a race with Newmark, BEK enticed BCF to work on BEK's behalf by signing an agreement misrepresenting that BCF had "exclusive authorization" to act on BEK's behalf in procuring equity for the project.[11]  Relying on BEK's misrepresentation, BCF forwent other opportunities and exerted efforts to procure equity for the project.[12]  These facts, if proven at trial, could support a judgment of liability on BCF's c. 93A claim.  See Brewster Wallcovering Co., 68 Mass. App. Ct. at 604-605.

---

[11] While it is true that BEK later sent BCF an offering document stating that Newmark had been granted the right to procure equity for the project, which may support the idea that BEK was not trying to hide anything from BCF, the timing and circumstances of this disclosure present an issue of fact that we do not resolve on summary judgment.  See Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 689 (2016) ("at the summary judgment stage a court does not resolve issues of material fact, assess credibility, or weigh evidence" [quotation and citation omitted]).

[12] At oral argument, BEK suggested that there are no damages on BCF's c. 93A claim but did not address whether BCF forwent other opportunities or exerted efforts to procure equity for the project, either of which could serve as a basis for damages.

4. <u>Real estate attachment</u>.  The final issue pertains to a real estate attachment that BCF obtained against property owned by BEK.  BEK dissolved the attachment by filing a surety bond pursuant to G. L. c. 223, § 120 (bond of dissolution).  Then, after prevailing on summary judgment, BEK moved for an order discharging the bond of dissolution.  A Superior Court judge allowed the motion, citing G. L. c. 223, § 114, which provides that a judge may "reduce or dissolve" an "excessive or unreasonable" attachment.

BCF's sole argument is that, as a matter of law, a judge may not order the discharge a bond of dissolution during the pendency of an appeal.  BCF points to G. L. c. 223, § 120, which provides that a bond of dissolution must be "conditioned to pay the plaintiff, within thirty days from the expiration of the time to appeal such final judgment, or within thirty days of the entry of an order of the supreme judicial court or the appeals court affirming such final judgment."  This language goes to the required terms of a bond of dissolution and does not address whether a judge may decide that the underlying real estate attachment is excessive or unreasonable pursuant to G. L. c. 223, § 114.  The judge's decision on this point was discretionary, see <u>Foster</u> v. <u>Evans</u>, 384 Mass. 687, 695 (1981), and nothing before us demonstrates that the judge abused his discretion in deciding that the underlying real estate

attachment was excessive or unreasonable, and that the resulting bond therefore should have been discharged.[13]

Conclusion. Based on the foregoing, we vacate the summary judgment on BCF's claim for violation of G. L. c. 93A and remand for further proceedings on that claim. In all other respects, the summary judgment is affirmed. The order discharging the surety bond is affirmed.

So ordered.

---

[13] Where we vacate the summary judgment on BCF's c. 93A claim and remand for further proceedings on that claim, nothing herein should be interpreted to preclude BCF, on remand, from moving for a new real estate attachment.