37 N.J. Super. 469 (1955)
117 A.2d 656
THE FIRST NEW HAMPSHIRE CORPORATION, PLAINTIFF-APPELLANT,
v.
FRANK VAN SYCKLE, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 10, 1955.
Decided October 21, 1955.
*470 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Frank C. O'Brien argued the cause for plaintiff-appellant (Messrs. Pitney, Hardin & Ward, attorneys).
Mr. John E. Toolan argued the cause for defendant-respondent (Messrs. Toolan, Haney & Romond, attorneys; Mr. Sam Weiss on the brief).
The opinion of the court was delivered by CLAPP, S.J.A.D.
This suit was brought by plaintiff to recover on its claim for brokerage services in connection with the sale of 22,500 shares representing 90% of the stock of the Perth Amboy National Bank at $90 a share, total $2,025,000. The Superior Court, Law Division, trying the case without a jury, found for the defendant. Plaintiff appeals.
*471 Plaintiff, as broker, and defendant, as owner of the stock, orally came to an agreement to this effect: if plaintiff produced a purchaser satisfactory to defendant, defendant was to sell his stock to the purchaser at such amount over $80 a share as was agreed upon by the plaintiff and the purchaser; and defendant was then to bill the purchaser for this amount, remitting to plaintiff any moneys paid defendant over the $80. But  and we conclude that this was in fact a part of the agreement between plaintiff and defendant  defendant was to pay this overage to the plaintiff only if and when he collected the moneys.
Under this view of the contract, the case comes down to one issue: was plaintiff entitled to compensation as a result of the sale consummated January 22, 1954?
The principles of law involved here are fairly well settled. The Restatement of Agency, § 448 (d) provides:
"Where a person employs only one broker to procure a customer, the broker ordinarily is entitled to his commission * * * if he causes a customer to negotiate with the principal and the customer makes a purchase without a substantial break in the ensuing negotiations."
See Tepperman v. Polster, 113 N.J.L. 14, 15 (E. & A 1934): "there was never any breaking off of negotiations * * *. They continued negotiations, although the broker was not notified of the same." See also Houston v. Siebert, 129 N.J.L. 468, 474 (E. & A. 1943): "there was no breaking off of negotiations." Both cases distinguish Murray Apfelbaum, Inc. v. Bernstein, 104 N.J.L. 664 (E. & A. 1928) on this point. See further 2 Mechem, Agency (2nd ed. 1914), p. 2023.
Defendant contends that plaintiff is entitled to no compensation because it did nothing toward the consummation of the sale after it had caused Bourne and the defendant to negotiate. But it was under no obligation to do more; it at no point abandoned the matter. To continue the above quotation taken from the Restatement of Agency, § 448(d):
*472 "It is not necessary that the broker conduct the negotiation or even be an influential factor in persuading the customer to accept the terms * * *."
As had been said, the broker need take no part in the negotiations. Weinstein v. Clementsen, 20 N.J. Super. 367, 372 (App. Div. 1952). In accord, see Weinstein v. Weinstein, 10 N.J. Super. 68, 72 (App. Div. 1950); cf. Queen v. Jennings, 93 N.J.L. 353, 356 (Sup. Ct. 1919).
The rule is the same even though the broker's right to compensation is made conditional (as it is here) upon the customer's purchase of the stock and its payment of the price. In this case, as the Restatement of Agency, § 448(b) puts it:
"the [broker's] compensation is dependent upon the subsequent purchase but is not dependent on his efforts toward accomplishing it."
In such a case, then, the broker may be said to have performed his part of the undertaking when he causes the seller to negotiate with a customer he produces, who is ready, able and willing to perform; however, the compensation is not due unless the transaction is consummated, Restatement of Agency, § 445 (e) (last paragraph), without a substantial break in the ensuing negotiations.
Applying these principles to the agreement at hand, we may say that the plaintiff became entitled to commissions if it caused a person to negotiate with defendant and that person purchased the stock and paid the price without a substantial break in the ensuing negotiations.
As we view the case, the main controversy here is whether there was a substantial break in the negotiations. We shall therefore have to trace the negotiations through to January 22, 1954.
It cannot be denied  and indeed it was in effect admitted at the argument  that plaintiff was the efficient procuring cause of the contracts of November 19 and December 22, 1953. Under the latter contract defendant and a private foundation organized by him agreed to sell to Standish T. *473 Bourne "or his nominees" the 22,500 shares at $83 a share, cash. It can hardly be denied  and it too was in effect admitted by the defendant, despite a contrary finding below  that the Post Publishing Company, which purchased the stock on January 22, was Bourne's so-called nominee under these contracts. We need not discuss the relationship between them, because defendant does not contest plaintiff's claim that in producing Bourne it produced Post. Post may be said to have the status of an associate or coadventurer with Bourne. 12 C.J.S., Brokers, § 91, p. 211.
However, the contract of December 22 which was to close on January 11 and 14, 1954, was in fact never consummated, though the parties attended the closing on January 11 and 12 (but not on the 14). Neither Post nor Bourne apparently was able to meet the terms of that contract. However, Post did buy the stock from defendant and his foundation January 22 on other terms, but without entering into any further contract of sale.
We come then to the first major circumstance on which defendant seems to rely to make out what we have described above as a substantial break in the negotiations. He claims that the deal was called off by mutual consent on January 12. On that day defendant and others, after sitting around two days, apparently said "the deal is off." However, before the conference broke up that day, Post offered the Cleveland Trust Company new collateral in order to obtain from it the loan of $1,750,000 which it needed to complete the sale. The Cleveland Trust's assistant counsel, who was at the closing, then told defendant that this offer had to be passed upon by the Trust Company's committee in Cleveland, and that defendant would be advised of the committee's action. Before defendant left the meeting, Bourne's counsel wrote out in longhand and signed an agreement providing for the deposit with him in escrow, of 10,000 shares of the Perth Amboy Bank stock and the Cleveland Trust Company's check for $830,000. (The agreement had called for a delivery of these shares on January 11 for $830,000.) Whether the stock was put in escrow is doubtful; but beyond *474 all question, the check was so deposited. The escrow instrument stated that, subject to the Trust Company's approval of Post's proposed new collateral and subject to a certain opinion from counsel, "the transaction will be completed as scheduled." Defendant's argument, that the negotiations were mutually called off on January 12, is specious.
Indeed the defendant himself pursued the negotiations after January 12 without loss of time. Doubtless hearing on January 13 or 14 of the Cleveland Trust Company's disapproval of Post's new proposal as to collateral, he telephoned the Trust Company apparently twice on January 14, asking it for a letter stating on what basis it would make the loan to Post. The Trust Company was reluctant to write some one other than its customer as to what it would do for the customer. Still he did manage to secure from it such a letter. Defendant's alleged failure of memory as to this incident casts doubt on a number of other things he testified to.
Events followed fast. Defendant had a talk as to the matter with his counsel and Elmer F. Blakey on January 14  with Blakey again on the 15 or 16  and with Blakey once more in the next day or two. (Until October 1953 Blakey had been president of the plaintiff and in charge of the matter for the plaintiff.) Defendant decided to help Post finance the deal, offering to take from it a note for part of the price and "to pay off [a lien] against the [so-called] gas properties [belonging to Post] * * * in order to make them available for assignment to the Cleveland Trust Company" so that the Trust Company would make Post the necessary loan. This he was willing to do provided Post increased the consideration from $83 to $90 a share. Defendant telephoned this proposal to the Trust Company, and the Trust Company telephoned Bourne at Boston about it. Blakey went to Boston to talk with Bourne, Bourne's counsel and Post's president, and he telephoned the Cleveland Trust Company. Clearly there was no substantial let up in the negotiations between January 12 and January 22 when the closing took place.
*475 Secondly, defendant claims in effect that new forces entered into the transaction which broke the chain of negotiations. We need not give consideration as to the general effect of such new forces. Cf. La Verde v. Impagliazzo, 125 A. 284 (R.I. Sup. Ct. 1924); Sherman v. Briggs Realty Co., 310 Mass. 408, 38 N.E.2d 637, 639 (Sup. Jud. Ct. 1941). We are concerned with the facts here.
There are two new forces on which defendant puts some stress, resulting first from the acts of Blakey after January 12 and second from defendant's own activity after that date. We deal first with Blakey.
Blakey at this time was acting not on plaintiff's behalf but in his own interest. According to an arrangement made in September or October 1953, he was to become president of the Perth Amboy National Bank under the new management  an arrangement that has in fact been carried out. Moved by this prospect, he agreed after January 12 to pledge certain property worth between $60,000 and $100,000 to secure Post's proposed note to defendant. This pledge and Blakey's acts following January 12 undoubtedly were a factor in the effectuation of the deal.
Blakey received no benefit from what he did other than the presidency of the bank. However it may be noticed that shortly after January 22, he went to plaintiff's associate broker (which had a 50% interest in plaintiff's commissions) saying he did not want anything from plaintiff but would accept what the associate broker might offer him.
But Blakey's acts did not constitute a substantial break in the chain of negotiations. He was deeply interested in the transaction as it stood on January 11 and 12, and what he did thereafter was a projection of those interests, a continuation and development of certain forces already involved in the transaction. What the effect would be if he had been an outsider, we need not consider.
Defendant lays stress also upon his own activity after January 12 and upon the fact that the completed sale which he helped to work out was for $2,025,000 payable $1,305,000 in cash and $720,000 in a note secured by certain collateral *476 and endorsements, while the previous one had been for $1,867,000 cash. But the continuity of negotiations between a buyer and seller is not severed because they themselves get together on terms differing from those stated to the broker. Steinberg v. Mindlin, 96 N.J.L. 206, 208 (E. & A. 1921); Walsh v. Isgro, 121 N.J.L. 165, 168 (E. & A. 1938); Houston v. Siebert, 129 N.J.L. 468, 472 (E. & A. 1942); Cohen v. Scola, 13 N.J. Super. 472, 475 (App. Div. 1951); Winter v. Toldt, 32 N.J. Super. 443, 449 (App. Div. 1954); 1 Mechem, Agency (2nd ed. 1914), 1140, 1141; 12 C.J.S., Brokers, § 86, p. 196.
Indeed, the similarities between the sale that was to close on January 11 and 14 and the one that was effected on January 22 demonstrate to some extent the close connection of one to the other. In both transactions one finds the same purchaser, Post, with the same Boston attorney representing it and Bourne; the same bank, Cleveland Trust Company, financing the transaction with a loan in the same amount, $1,750,000; the same person, Blakey, to be president of the Perth Amboy National Bank; the same representations and warranties set out in the November 19 agreement being doubtless assumed by the buyer's attorney as supporting the final transaction; and the same seven persons who were at the January 12 meeting (defendant, his counsel, Bourne, Bourne's and Post's counsel, Blakey, a vice-president of the Cleveland Trust and its assistant counsel) being among those at the closing.
The question as to whether there has been a substantial break in the negotiations turns on the facts of the particular case. But here the sale of January 22 is a part of the very stream of negotiations which produced the contracts of November 19 and December 22 and the attempted closing on January 11 and 12. A very telling circumstance in establishing the substantial continuity of the dealings which extended from prior to January 12 until January 22 was the fact that only ten days elapsed between those dates  a period busy with negotiations.
*477 One more matter might be noticed. Under its brokerage agreement plaintiff was entitled to all the moneys received by the seller over $80 a share. Actually the payment made to the defendant and his foundation at the closing on January 22 was at the rate of $58 a share in cash and $32 a share by way of a note, total $90. The note was paid off five months after the sale and two months after this action was started. But no point is made of these matters by defendant. Plaintiff expressly waives any claim to commissions in excess of the $3 a share; it calculates its commissions on the price of $83 a share fixed by the contracts of November 19 and December 22. And we need not consider whether it had a right to the additional $7 collected by the sellers.
Reversed, with direction to enter judgment below for plaintiff in the amount of $67,500, with interest from January 22, 1954.