**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3804-21

EXPRESS BROKERAGE,
d/b/a RAZA FAISAL,

     Plaintiff-Appellant,

v.

THERESA VARGAS, BERGEN
PASSAIC AMBULATORY
SURGERY CENTER, INC.,
MEGA MEDICAL GROUP, LLC,
DR. MIRZA BEG, and
DR. SHAMS QURESHI,

     Defendant-Respondents.

_____

Submitted January 24, 2024 – Decided March 6, 2024

Before Judges Currier and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-8917-18.

Robert A. Skoblar, attorney for appellant.

Callagy Law, PC, attorneys for respondents (Robert J. Solomon, of counsel and on the brief).

PER CURIAM

This matter arises out of a dispute concerning a brokerage agreement for the sale of a medical practice and surgical center. Plaintiff Express Brokerage (Express) contends it was not paid a finder's fee it was entitled to, prompting it to file a lawsuit alleging breach of contract, fraud, unjust enrichment, and quantum meruit. Plaintiff appeals a June 28, 2022 Law Division order excluding text messages from trial and a June 29, 2022 order[1] entering judgment in favor of defendants Theresa Vargas, Bergen Passaic Ambulatory Surgery Center, Inc. (BPASC), Dr. Mirza Beg, Dr. Shams Qureshi, and Mega Medical Group, LLC (Mega Medical) following a bench trial. After carefully reviewing the record in light of the governing legal principles and arguments of the parties, we affirm.

I.

We discern the following facts and procedural history from the record. Plaintiff introduces buyers to sellers to help effectuate the sale of a business. The amended complaint asserted Raza Faisal is a principal of Express and the action was brought by "Express Brokerage d/b/a Raza Faisal." However, Faisal testified he is only an employee of Express, which is owned by his daughter.

---

[1] Plaintiff also challenges a February 16, 2022 order granting partial summary judgment against it and a March 18, 2022 order quashing plaintiff's request for admissions. As we explain, those orders are not properly part of this appeal. We decline to review them on the merits.

Defendant BPASC is an ambulatory surgical center providing services to physicians. In 2014, Vargas—BPASC's owner—wanted to sell the business and began looking into services to effectuate the sale.

BPASC and Mega Medical were in the same building. Mega Medical is a separate corporation owned by Beg. Vargas was Mega Medical's "administrative head" and "financial advisor."[2]

On June 24, 2014, BPASC entered into a contract with Express to aid in the sale of BPASC in exchange for a finder's fee. Express was contracted to introduce BPASC to potential buyers and help arrange the sale of BPASC, limited to a six-month time frame. Vargas executed the agreement on behalf of BPASC. Faisal executed the agreement on behalf of Express. According to Vargas' testimony, Faisal entered into the agreement in his capacity as an owner of Express. See supra note 2.

Capital Business Brokers of New Jersey (CBB) negotiates commercial business transactions on a commission basis. In July 2014, Faisal contacted CBB asking whether they knew of buyers interested in purchasing a surgical

---

[2] In the complaint, plaintiff alleged Vargas was an owner of Mega Medical, which has since been disproven. Plaintiff then pivoted, arguing Vargas was "a de facto owner" of Mega Medical.

A-3804-21

center. Kate Costello, the principal of CBB, met with plaintiff and Vargas to discuss an agreement whereby CBB would market BPASC to potential buyers.

Plaintiff made it clear to Costello that if she were to introduce a buyer to the transaction, she must obtain compensation from the buyer or negotiate her own agreement with BPASC. CBB and BPASC entered into a separate agreement concerning CBB's commission.

During her trial testimony, Vargas identified Costello as the broker that brought Dr. Amit Poonia—the individual who ultimately purchased BPASC—into BPASC in December 2014. Vargas identified a December 2, 2014 agreement between CBB and BPASC. That agreement did not mention plaintiff, Faisal, or the finder's agreement between BPASC and plaintiff.

Plaintiff alleged an oral contract existed outside of the finder's agreement, entitling Express to a $100,000 commission tied to CBB's performance based upon a conversation Faisal claims occurred between Costello, Vargas, and himself in July 2014. Despite plaintiff's contention, the finder's agreement states unequivocally it "embodies the entire understanding between the parties" and the "agreement may not be assigned or modified without the written consent of both parties."

4

At trial, there was a factual dispute as to who introduced Poonia to Vargas. Faisal testified he introduced Vargas to Poonia around June 27, 2014. Costello testified she brought Poonia to BPASC around December 2, 2014, which was when Poonia became aware Mega Medical was also for sale. Poonia learned he could purchase the entire building housing BPASC and Mega Medical.

On October 6, 2015—well past the finder's agreement's six-month timeframe—Poonia purchased BPASC for $3,000,000. At the closing, CBB was paid $100,000. Poonia also purchased Mega Medical for $1,500,000. Plaintiff did not receive any payment in connection with either sale.

Faisal claimed that when he found out about the sale of Mega Medical, he spoke to Vargas who told him "not to worry" and that he would "be taken care of regarding the sale of Mega Medical." Vargas denied ever entering into a finder's agreement with Faisal or plaintiff for the sale of Mega Medical. Vargas also denied telling Faisal she would pay him $80,000 for the sale of Mega Medical and BPASC. No additional written agreements between Vargas/BPASC and Faisal/Express were entered into evidence during trial.

On September 19, 2019, plaintiff filed an amended complaint alleging breach of contract against Vargas and BPASC (count one); fraud against Vargas and Qureshi pertaining to the sale of BPASC (count two); breach of contract

5

against Vargas, Beg, and Mega Medical (count three); fraud against Vargas and Beg pertaining to the sale of Mega Medical (count four); unjust enrichment against all defendants (count five); and quantum meruit against all defendants (count six).

Following the close of discovery, on January 7, 2022, defendants Vargas and BPASC moved for summary judgment, which plaintiff opposed. On February 16, 2022, the judge granted the motion for summary judgment in part and denied it in part. The order dismissed counts two, four, five and six. Counts one and three survived.[3]

On February 7, 2022, after discovery closed and the summary judgment motion was decided, plaintiff served requests for admissions due thirty days following service. At this point, the matter was scheduled to be tried on March 6, 2022. The judge quashed the request for admissions as untimely.

Because of scheduling conflicts, the trial was delayed until June 2022. On June 14, 2022, plaintiff served defendants with "nearly fifty pages" of "recently recovered" text messages. Defendants filed a motion in limine seeking to

---

[3] The remaining counts do not involve defendant Qureshi. Plaintiff's brief claims "Qureshi filed for bankruptcy and the case was stayed as to him." However, there is no documentation supporting this in the appellate record.

A-3804-21

prevent plaintiff from using the text messages at trial. The trial judge granted defendants' motion.

A bench trial was convened on June 28, 2022 and June 29, 2022. Following closing arguments, the trial judge delivered her decision on the record. She found the purported verbal agreement was not memorialized in writing. The judge found "it incredulous that an experienced broker would not have memorialized the terms of the agreement [specifying] payment for services rendered." Even if a verbal agreement existed, the judge concluded the finder's agreement was clear that a modification or extension of the agreement had to be reduced to a writing signed by both parties.

As to plaintiff's breach of contract claim against BPASC and Vargas, the trial judge found the record clearly established a contract existed between Express and BPASC. Despite questions regarding Faisal's employment status, the judge determined "the terms were sufficiently defined [regarding] the part of the performance to be rendered by each party and this [c]ourt was able to ascertain those performance obligations with reasonable certainty," citing to West Caldwell v. Caldwell, 26 N.J. 9, 24-25 (1958). The judge concluded Vargas and Express "had agreed upon essential terms of the finder's fee and they

manifested an intention to be bound by those [terms]; therefore, they created an enforceable contract."

The trial judge further concluded plaintiff had not met its burden of establishing BPASC breached its contract with Express. The sale was not completed within the term of the agreement and there was no extension of the finder's fee agreement. Accordingly, as to count one, the trial judge found for BPASC and dismissed that count.

The judge then turned her analysis to plaintiff's breach of contract claim as to Vargas and Mega Medical. She found plaintiff failed to establish an agreement existed between Mega Medical, its then-owner Beg, and Express/Faisal, let alone that any agreement was breached. In absence of any written contract, the trial judge found in favor of Mega Medical and Beg and dismissed count three.

Concerning the factual dispute as to who introduced Poonia to Vargas, the judge found Costello, "to be very credible in that she is an experienced broker" and was clear in her testimony. In contrast, the trial judge found Faisal did not accurately recall dates, did not provide straight answers or detailed testimony, and embellished his testimony. The judge noted she had to interrupt Faisal's testimony "on several occasions so that he would stay on task and provide

8

accurate testimony." She was troubled by Faisal's use of his wife's work email address to correspond with his prior attorney. The judge found it "odd" a company established for at least ten years would not have its own email. Additionally, the judge highlighted the "internal contradiction" of Faisal's testimony regarding his position in Express as an employee compared to the complaint asserting he is a principal.

Based on the foregoing findings, the trial judge entered judgment in favor of defendants and dismissed plaintiff's complaint in its entirety. Plaintiff's counsel then asked a question about a motion for reconsideration, but no such motion was ever made.

This appeal follows. Plaintiff contends the motion judge's summary dismissal of four counts of its complaint should be reversed because plaintiff was not afforded reasonable inferences and the motion judge erred when it quashed plaintiff's request for admissions. Plaintiff also contends: the trial judge ignored overwhelming evidence that plaintiff was the efficient procuring cause of both sales; the trial judge committed erred by excluding the text messages; and the trial judge's "belligerent attitude" towards plaintiff and his counsel amounted to a denial of due process.

II.

We first address plaintiff's contention the February 16, 2022 order granting summary judgment dismissal of counts two, four, five and six of the complaint should be reversed because the motion judge did not afford reasonable inferences to plaintiff. It should be noted plaintiff did not indicate in its notice of appeal that it was appealing the February 16, 2022 order granting partial summary judgment.[4] Nor did plaintiff serve notice of the appeal on the motion court judge. R. 2:5.1(c)(1).

Additionally, the defendants who were dismissed from the lawsuit by the grant of partial summary judgment[5] did not receive adequate notice the order dismissing plaintiff's counts against them would be the subject of this appeal.

We adhere to the well-established principle only the judgments or orders or parts thereof designated in the notice of appeal are subject to the appeal process and review. See Pressler & Verniero, Current N.J. Court Rules, cmt. on R. 2:5-1(f) (2023); Sikes v. Twp. of Rockaway, 269 N.J. Super. 463, 465-66

---

[4] Plaintiff's notice of appeal states he is appealing from the "June 29, 2022 [o]rder dismissing complaint," identifying it as the "judgment filed after bench trial (June 28, 2022) dismissing [p]laintiff's complaint in its entirety against all remaining defendants."

[5] The order granting partial summary judgment dismissed all counts against Qureshi and Beg.

(App. Div. 1994), aff'd o.b., 138 N.J. 41 (1994); 1266 Apt. Corp. v. New Horizon Deli, 368 N.J. Super. 456, 459 (App. Div. 2004).  Accordingly, this argument is not properly before us.  We therefore decline to hear it on the merits.

### III.

We reach a similar conclusion with respect to plaintiff's contention the motion court erred when it entered a March 18, 2022 order quashing plaintiff's request for admissions.  Yet again, plaintiff did not indicate he was appealing this order in his notice of appeal.  As noted, the notice of appeal did not indicate plaintiff was challenging any decision by the motion judge; it only refers to the trial judge.  See supra note 6.

We add, based on the record before us, it does not appear that plaintiff served the notice of appeal on the motion judge as required by R. 2:5.1(c)(1). Plaintiff provided us only a copy of the motion court order without any written or oral decision.  On this record, it is not possible to determine whether the motion judge abused its discretion.  Accordingly, we conclude this argument is not properly before this court.  We decline to address it on the merits.

### IV.

We turn next to plaintiff's contention the trial judge erred by excluding the fifty pages of text messages served on defendants two weeks before trial.[6] We begin our analysis by acknowledging an appellate court defers "to a trial court's evidentiary ruling absent an abuse of discretion." State v. Garcia, 245 N.J. 412, 430 (2021). Appellate courts review the trial court's evidentiary ruling "'under the abuse of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion.'" State v. Prall, 231 N.J. 567, 580 (2018) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)). "Under that deferential standard, we review a trial court's evidentiary ruling only for a 'clear error in judgment.'" State v. Medina, 242 N.J. 397, 412 (2020) (quoting State v. Scott, 229 N.J. 469, 479 (2017)).

The trial judge granted defendants' motion to exclude the additional text messages, citing Rule 4:10-3, which prescribes how discovery is to be conducted in litigation. Plaintiff offered no case law permitting it to serve documents not disclosed during discovery as part of a pretrial exchange. The trial judge also found it "incredulous" that plaintiff knew of the existence of these messages and,

---

[6] Although this issue is not identified in the notice of appeal, see supra note 6, the trial judge's decision is part of the appellate record. We choose to address this contention on the merits.

almost two years after the close of discovery, suddenly realized he was able to recover the messages. Accordingly, the trial judge found "no basis to permit [plaintiff] to conduct trial by ambush by serving belated discovery, when there [are] no exceptional circumstances that have been demonstrated to warrant the denial of the motion."

We conclude the trial judge did not abuse her discretion in the way she enforced the rules of discovery. As the trial judge stressed, plaintiff did not provide any legal support for its position; nor did plaintiff demonstrate exceptional circumstances to allow the late submission of evidence.

V.

Plaintiff's main argument on appeal is the trial judge erred by "ignor[ing] overwhelming evidence" plaintiff "was a substantial procuring cause" of BPASC and Mega Medical's sales. "We review the trial court's determinations, premised on the testimony of witnesses and written evidence at a bench trial, in accordance with a deferential standard." D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013). Moreover, appellate courts "'do not disturb the factual findings and legal conclusions of the trial judge unless convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and

13

reasonably credible evidence so as to offend the interests of justice.'" Ibid. (quoting Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011)).

The efficient procuring cause doctrine was developed in case law to ensure equitable results when a contract does not otherwise expressly specify the conditions precedent to earning a commission. See First N.H. Corp. v. Van Syckle, 37 N.J. Super. 469, 472 (App. Div. 1955) (articulating the rule that a broker is the efficient procuring cause of a transaction if they "caused a person to negotiate with [the] defendant and that person purchased the stock and paid the price without a substantial break in the ensuing negotiations"). The doctrine's basic application is:

> [I]n the absence of some qualifying or oppugnant repugnant? expression in the contract of employment, a broker who is duly engaged earns his commission when he procures for the owner a purchaser ready, able, and willing to comply with the terms specified in the authority thus conferred, or with other or different terms which, however, are satisfactory to the owner.
>
> [George H. Beckmann, Inc. v. (Zinke's) Rainbow's End, Inc., 40 N.J. Super. 193, 196 (App. Div. 1956) (citing Marschalk v. Weber, 11 N.J. Super. 16, 21 (App. Div. 1950)).]

Accordingly, we have applied the doctrine "to permit a broker to recover a commission upon a sale made [even] after [the] expiration of an exclusive . . .

brokerage contract." Leadership Real Estate, Inc. v. Harper, 271 N.J. Super. 152, 183 (Law. Div. 1993).

For the efficient procuring cause doctrine to apply, a "broker must prove that he or she caused his or her customer to negotiate with the seller and that the transaction is later consummated through direct negotiations between the seller and the broker's customer, even though the seller accepts terms different from those expressed in the listing agreement." Ibid. Of particular importance in this case, the doctrine further provides that the customer must make "the purchase without a substantial break in the ensuing negotiations." Ibid. The mere act of introducing a buyer to the property is not enough to constitute an efficient procuring cause of the sale. See C.B. Snyder Realty Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 81 (App. Div. 1989) ("[I]t is clear that plaintiff introduced [defendant] to the property. However, that does not suffice to establish plaintiff's claim to a commission.").

In the matter before us, we are not persuaded plaintiff established the basis for applying the efficient procuring cause doctrine. When a contract between a broker and property seller explicitly provides the circumstances under which the broker is entitled to a commission, a court called upon to review and enforce the contract must look first to the terms of the contract. A court may not

15

superimpose onto the contract the elements of the efficient procuring cause doctrine if the contract adequately expresses the agreement of the parties as to when the broker is entitled to a commission. See Grubb & Ellis/Centennial, Inc. v. Gaedeke Holdings, Ltd., 401 F.3d 770, 774, 778-79 (6th Cir. 2005) (holding the procuring cause doctrine does not apply when the contract does not require a party to establish it was the procuring cause); Aerotronics, Inc. v. Pneumo Abex Corp., 62 F.3d 1053, 1064 (8th Cir. 1995) ("[T]he procuring cause doctrine is limited by the terms of a contract; it cannot be used to supplant or contradict the terms of a contract entered into between parties.").

This approach is consonant with the bedrock principle that the court "cannot 'rewrite a contract for the parties better than or different from the one they wrote for themselves.'" GMAC Mortg., LLC. v. Willoughby, 230 N.J. 172, 186 (2017) (quoting Kieffer v. Best Buy, 205 N.J. 213, 223 (2011)). Rather, when examining a contract, the task of the reviewing court is to "enforce the contract according to its terms, giving those terms 'their plain and ordinary meaning.'" Ibid. (quoting Kieffer, 205 N.J. at 223).

Here, the trial judge did just that. She determined "the terms [of the agreement] were sufficiently defined . . . and th[e] [c]ourt was able to ascertain those performance obligations with reasonable certainty." She found the sale

was not completed within the term of the agreement and it was not extended. The trial judge further reasoned that even if a verbal agreement existed, the finder's fee agreement was very clear that a modification or extension of the agreement needed to be reduced to a writing signed by both parties. No such writing exists. Accordingly, the judge concluded Faisal's actions contravened the written agreement's express terms and could not be used to invoke the efficient procuring cause doctrine.

We are satisfied the trial judge's findings of facts and conclusions of law were well supported by the record. Plaintiff's argument on appeal focuses on Costello's testimony, who the trial judge found to be a credible witness. Costello testified she brought Poonia to the transaction, not Faisal.

Furthermore, plaintiff had the burden to prove an agreement existed between BPASC and Express as to count one and between Mega Medical and Express as to count three. Plaintiff did not establish the existence of any agreement as to Mega Medical. The agreement as to BPASC expired before the sale was effectuated. Considering the clear terms of the finder's fee agreement, we agree with the trial judge's conclusion the efficient procuring cause doctrine does not apply.

Lastly, plaintiff contends he was denied due process because the trial judge was biased and displayed a "belligerent attitude." Nothing in the record suggests a basis for recusal or disqualification. Accordingly, this argument lacks sufficient merit to warrant extensive discussion. See R. 2:11-3(e)(1)(E).

A judge "shall be disqualified" if there is any reason "which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so." R. 1:12-1(g); see also Code of Jud. Conduct, r. 3.17(B)(1) ("Judges shall disqualify themselves if they have a personal bias or prejudice toward a party or a party's lawyer."). "The disqualification decision is initially left to the discretion of the trial court." State v. Marshall, 148 N.J. 89, 275-76 (1997). "[J]udges are not free to err on the side of caution; it is improper for a court to recuse itself unless the factual bases for its disqualification are shown by the movant to be true or are already known by the court." Id. at 276.

Importantly, plaintiff did not file a motion to recuse the trial judge pursuant to Rule 1:12-2. Nor does the record disclose any basis to conclude the trial judge should have disqualified herself on the court's own motion. See R. 1:12-1. "'Fundamental to any consideration of possible judicial disqualification

is a showing of prejudice or potential bias.'" Marshall, 148 N.J. at 276 (quoting State v. Flowers, 109 N.J. Super. 309, 312 (App. Div. 1970)). "Bias cannot be inferred from adverse rulings against a party." Strahan v. Strahan, 402 N.J. Super. 298, 318 (App. Div. 2008). The "unduly harsh statements" plaintiff relies on are nothing more than the trial court exercising control of the courtroom and requesting counsel to support arguments with citations to precedent or court rules.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION